IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

CARALEE R. AKKERHUIS,       )
                                 )
           Plaintiff,         )
                                 )
       v.                   )     Case No.
                                 )     13-3159-CV-S-REL-SSA
CAROLYN W. COLVIN, Acting    )
Commissioner of Social Security,   )
                                 )
           Defendant.     )

**ORDER REVERSING THE DECISION OF THE COMMISSION
AND REMANDING FOR FURTHER CONSIDERATION**

Plaintiff Caralee Akkerhuis seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Titles II and XVI of

the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) ignoring plaintiff's

consistently low GAF scores, and (2) improperly finding that plaintiff's mental impairment

does not meet Listing 12.08 (personality disorders). I find that the ALJ's decision is not

supported by the substantial evidence in the record. However, I also find that the evidence in

the record is insufficient for a finding of disability at this time. Substantial evidence in the

record suggests that plaintiff may be disabled due to a mental impairment that has not been

adequately addressed by any medical professional, nor has it been adequately considered by

the ALJ. Because there is insufficient evidence in the record to determine whether plaintiff is

disabled, I reluctantly[1] find that remand is necessary. Therefore, the decision of the

Commissioner will be reversed and this case will be remanded in accordance with the

discussion below.

---

[1]This case has been pending for many years and has already bounced back and forth from
the administrative court to federal court; therefore, it is unfortunate that a final decision
cannot be made at this time. However, I believe plaintiff is entitled to have her case considered
further and that additional evidence will be required to make a valid determination regarding
her ability to work.

## I.  BACKGROUND

On August 6, 2007, plaintiff applied for disability benefits alleging that she had been disabled since April 4, 2007.  Plaintiff's disability stems from arthritis in her legs and back, a right leg injury, high blood pressure, memory loss, a heart condition, and post traumatic stress disorder.  Plaintiff's application was denied.  On March 25, 2009, a hearing was held before an Administrative Law Judge.  On May 18, 2009, Administrative Law Judge Edward Starr found plaintiff disabled as of November 13, 2008, which was approximately a year and a half after her alleged onset date (Tr. at 37-47).  Plaintiff appealed the partially favorable decision. On December 9, 2010, the Appeals Council denied review (Tr. at 683).  Plaintiff appealed to federal district court, and on October 3, 2011, Judge Nanette Laughrey reversed the decision of the Commissioner and remanded for further consideration (Tr. at 687-698).  On December 19, 2011, the Appeals Council vacated the final decision of the Commissioner pursuant to the court's sentence four reversal and remand, and directed the ALJ to offer plaintiff an opportunity for a hearing and "take any further action needed to complete the administrative record and issue a new decision." (Tr. at 701).

On  November 27, 2012, a hearing was held before Administrative Law Judge David Fromme.  On February 11, 2013, the ALJ found that plaintiff was not under a "disability" as defined in the Act.[2]  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

---

[2]I note that plaintiff, in her brief, described the ALJ's order as containing a "markedly vindictive tone" (see plaintiff's brief at pages 1-2).  I do not agree with plaintiff's characterization of the ALJ's order.  I also point out that plaintiff did not object to the ALJ's legal analysis as far as what decision was left to be made after the first remand from federal court.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

3

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

    1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

    2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

    3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

    4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

    5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational experts Patti Kent and Michael Lala, in addition to documentary evidence admitted at the hearings.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1978 through 2012, shown in actual and indexed figures:

| Year | Actual Earnings | Indexed Earnings |
|------|-----------------|------------------|
| 1978 | $ 2,602.92 | $ 9,111.91 |
| 1979 | 4,735.32 | 15,243.23 |
| 1980 | 4,382.72 | 12,942.41 |
| 1981 | 5,004.68 | 13,427.45 |
| 1982 | 7,353.58 | 18,700.02 |
| 1983 | 7,559.98 | 18,331.85 |
| 1984 | 7,651.34 | 17,523.29 |
| 1985 | 9,296.06 | 20,420.06 |
| 1986 | 9,000.72 | 19,201.39 |
| 1987 | 10,458.22 | 20,973.15 |
| 1988 | 9,384.50 | 17,936.49 |
| 1989 | 11,550.65 | 21,235.82 |
| 1990 | 10,350.48 | 18,189.13 |
| 1991 | 11,803.60 | 19,997.51 |
| 1992 | 15,958.14 | 25,711.33 |
| 1993 | 2,504.13 | 4,000.19 |
| 1994 | 2,500.47 | 3,889.94 |
| 1995 | 8,421.58 | 12,596.39 |
| 1996 | 3,662.13 | 5,222.16 |
| 1997 | 6,790.43 | 9,149.21 |
| 1998 | 5,791.04 | 7,414.60 |
| 1999 | 8,093.24 | 9,815.25 |
| 2000 | 11,978.78 | 13,766.25 |
| 2001 | 4,072.50 | 4,571.14 |
| 2002 | 7,510.92 | 8,346.86 |
| 2003 | 8,793.55 | 9,539.06 |
| 2004 | 8,520.77 | 8,832.55 |
| 2005 | 4,417.13 | 4,417.13 |
| 2006 | 11,760.10 | 11,760.10 |

| 2007 | 1,492.20 | 1,492.20 |
| 2008 | 0.00 | 0.00 |
| 2009 | 0.00 | 0.00 |
| 2010 | 0.00 | 0.00 |
| 2011 | 0.00 | 0.00 |
| 2012 | 0.00 | 0.00 |

(Tr. at 98-99, 779).

**Function Report - Adult**

In this form dated August 20, 2007, plaintiff described her day as follows: "Get my 11 yr old off to school. Organize my day and get it done by 3:00 pm. Get [my son's] homework done, cook dinner, get everything ready for next day and do it again M-F." (Tr. at 136-143). She is able to bathe and feed cats and dogs. Her memory is so bad she cannot remember if she has showered, and she needs someone to remind her to take her medicine. She is able to prepare complete meals for herself and her son every day. Her son does the laundry and the household chores. She goes out of her home daily either walking or using public transportation. She is able to go out alone. She cannot drive because her leg hurts too much to use the gas pedal. She shops in stores and by computer. She is able to pay bills, count change, and handle bank accounts. Her hobbies include "anything outdoors" but she can no longer participate in these hobbies due to "way too much pain in right leg."

Plaintiff visits and shops with others as often as she can and at least once a week. She goes to church on a regular basis. She needs to be reminded to go, but she does not need anyone to accompany her. She has problems getting along with others because she has no patience.

Plaintiff's condition affects her ability to climb stairs, bend, stand, kneel, walk, squat, sit, concentrate and complete tasks. Her condition does not affect her ability to lift, use her hands, understand, remember, follow instructions, reach, or get along with others. She can walk 1/4 mile before needing to rest for 5 to 10 minutes. She can follow written instructions well.

*B.*   *SUMMARY OF TESTIMONY*

There have been three administrative hearings in this case:  March 25, 2009; August 3, 2012 (with no testimony taken); and November 27, 2012.

During the March 25, 2009, hearing, plaintiff testified; and Patti Kent, a vocational expert, testified at the request of the ALJ.  Prior to the hearing she completed interrogatories (Tr. at 173-175).

**Plaintiff's testimony.**

Plaintiff was born in 1959 (Tr. at 9, 788).  She was 47 on her alleged onset date and is currently 55 years of age.  She is 5'7" tall and weighs 286 pounds (Tr. at 22, 801).  She weighed this much in 2003 (Tr. at 22, 801).  In 1993 she weighed 190 pounds (Tr. at 22-23, 801-802).  She gained almost 100 pounds because she eats too much, she has thyroid problems, and she has not been able to do much of anything (Tr. at 23, 802).  Plaintiff was in a "pretty bad" car accident in April 2007 (Tr. at 11-12, 790-791).  She has not worked since then (Tr. at 12, 791).  Prior to that, in June 2006 and in February 2007, plaintiff slipped at work and was injured (Tr. at 12, 791).

Plaintiff is unable to work because she cannot concentrate, she cannot stand, she gets nervous and has terrible panic attacks (Tr. at 13, 792).  From 2001 to 2003 plaintiff was hit in the head and knocked out five or six times by her former husband (Tr. at 13, 792).  Plaintiff has intermittent explosive behavior, and she will all of a sudden start screaming and cussing (Tr. at 13, 792).  Then she does not remember why she was doing it (Tr. at 13, 792).  Plaintiff has episodes where she does not know who she is or where she is (Tr. at 16, 795).  She gets scared and she gets very loud (Tr. at 17, 796).  This happens approximately every other day and gets "real bad" when she does not take her medicine (Tr. at 17, 796).  When the episode is

over, she does not know what she said to people (Tr. at 17, 796). She had an episode the day before the administrative hearing (Tr. at 17, 796).

Plaintiff had difficulty filling out forms because she cannot remember things and she does not understand (Tr. at 23, 802).

Plaintiff's knees pop out, and her legs swell so that she cannot put on her shoes (Tr. at 14, 793). Her right knee is worse (Tr. at 14, 793). She has moderate to severe pain in her right knee every day (Tr. at 15, 794). She has mild pain about one-fourth of the time in her left knee (Tr. at 15, 794). She has pain in her shoulders every few days (Tr. at 15-16, 794-795). She has pain in her lower back every four or five days (Tr. at 16, 795). She gets a headache first and then the pain moves to her lower back (Tr. at 16, 795).

Plaintiff lives with a man and her son (Tr. at 20, 799). On a typical day plaintiff spends most of the day in her bed (Tr. at 18, 797). She reads while she is in bed, but she does not remember what she read afterward (Tr. at 18, 797). She reads cowboy stories (Tr. at 18, 797). Plaintiff does not own a television because she hears things from the television (Tr. at 18-19, 797-798). Plaintiff tries not to go anywhere because she does not want to have an episode in public (Tr. at 19, 798). If she has an episode while home alone, it is hard for her to come out of it (Tr. at 19, 798).

Plaintiff has trouble staying focused and she has trouble with her memory (Tr. at 19-20, 798-799). She has to write down her doctor appointments or she will not remember them (Tr. at 20, 799). Plaintiff goes to bed around 9:30 or 10:00 at night but sometimes she does not go to sleep until 3:00 or 4:00 in the morning (Tr. at 20, 799). Her mind "plays like a . . . movie that . . . just goes over and over" (Tr. at 20, 799).

Plaintiff has highs and lows from bipolar disorder (Tr. at 21, 800). When she is on a high, she cannot stop talking (Tr. at 21, 800). That happens about once a week (Tr. at 21,

800).  Most of the time she is "low" (Tr. at 21, 800).  Plaintiff does not want to be around anyone because people make her nervous (Tr. at 21-22, 800-801).  Plaintiff was in Ozark Behavioral Health in 2002, so she has had this problem for a long time, but now her symptoms are more frequent (Tr. at 22, 801).

**Vocational expert testimony.**

Vocational expert Patti Kent testified at the request of the Administrative Law Judge.  On the day of the hearing, Ms. Kent completed interrogatories containing the following hypothetical:  A person who is a younger individual with a high school education who can lift and carry 20 pounds occasionally and 10 pounds frequently; sit for 6 hours; stand or walk for 2 hours; who has moderate restrictions in maintaining social functioning; activities of daily living; and maintaining concentration, persistence and pace; is moderately limited in understanding, remembering and carrying out detailed instructions, responding appropriately to usual work situations and routine work changes, and in the ability to interact appropriately with the public.  "Moderately limited means there is more than a slight limitation, but the person can still perform in a satisfactory manner."  The person is capable of doing work in which interpersonal contact is incidental to the work performed, complexity of tasks is learned and performed by rote, with few variables and little judgment required. Supervision required is simple, direct, and concrete.  The vocational expert indicated that such a person could work as a production worker or machine tender.[3]

The second hypothetical incorporated the findings of Vann Smith, Ph.D., and the vocational expert responded that no jobs would be available due to the inability to complete a normal workday without rest and the inability to perform at a consistent pace.

---

[3]There is a third job listed, but it is illegible.

The first hypothetical posed at the hearing involved a person who consistently misses at least one day of work per month (Tr. at 25, 804). A person limited to unskilled work could not perform substantial gainful activity with this limitation (Tr. at 25, 804). If a person were not able to perform at a competitive pace for 10 percent of the day, the person could not work (Tr. at 25, 804). If the person blows up at a supervisor or coworker for five minutes at a time every other day, the person "would lose his job" (Tr. at 25, 804).

During the August 3, 2012, hearing, no testimony was taken. The ALJ indicated that because the Appeal's Council vacated the first decision of the ALJ, at the direction of the district court, the issue of whether plaintiff is or has ever been disabled is what needs to be resolved. Plaintiff had been under the impression that only the issue of whether her disability began in April 2007 versus November 2008 would be revisited. The ALJ took a recess during the hearing, and then stated as follows:

> The situation is this. We have an order of the U.S. District Court remanding the case without limiting consideration to any particular period of time. The Appeals Council order vacates the final decision of the Commissioner and remands it to me for consideration of the case without limitation to any specific period of time. And so it is thought that I am to proceed on the case without limiting consideration to any specific period of time. And your request for withdrawal of the request for hearing jeopardizes and likely would end entitlement because there is no decision at all at this point as far as I can tell. There is no final decision. It's been vacated. So we're starting from scratch and that's -- I don't know what else I can say. That's just the way it shows up to me and that I don't have any option but to go ahead.

Plaintiff then requested a continuance of the hearing because her caretaker, Norman Mings, was not present but would be able to provide testimony relevant to plaintiff's condition subsequent to November 2008 (Tr. at 660-675). That request was granted.

During the November 27, 2012, hearing, plaintiff testified, and vocational expert Michael Lala testified at the request of the ALJ.

**Plaintiff's testimony.**

At the time of this hearing, plaintiff was living alone in a house (Tr. at 630). She had medical insurance (Tr. at 630-631). Plaintiff has a GED but no further education (Tr. at 631). Up until 1998 plaintiff worked at Subway, first as a sandwich maker and later as an assistant manager (Tr. at 631). She worked as a cashier at Wal-Mart in 1998 (Tr. at 631). She worked there full time for three years and left that job because she moved (Tr. at 631-632). In 2000 she was a cashier at a convenience store and left there to take a job at Richard Brothers, a deli (Tr. at 632). She left that deli in 2002 when she moved to Arkansas (Tr. at 632). In 2003 she started a part-time job at a day care, and in 2005 she took a job at a deli at Town and Country Discount Foods (Tr. at 632). That was a full-time job, and she left that job when her part-time job at a pizza restaurant became full time (Tr. at 633). That job ended when she was in a car accident on April 4, 2007, and she has not worked since (Tr. at 633).

Plaintiff did not work after April 4, 2007, because her back and her knee were hurting too much (Tr. at 634). She went to the emergency room several times to get pain medication (Tr. at 634). Her pain is constant and is moderate to severe (Tr. at 635). Her pain was so bad that she could not stand it even with her pain medication (Tr. at 635). Her knee pain is also constant and is moderate in severity (Tr. at 635). Her pain prevented her from sleeping (Tr. at 635). Plaintiff's attorney went over plaintiff's medications from that time period -- Celexa, Lisinopril, Zantac, Toprol, and Levothyroid -- and then asked, "Tell us if you will, was the pain medicine that you were taking, did it help at all?" (Tr. at 636). I note that none of those medications is for pain. Celexa is an antidepressant, Lisinopril treats hypertension, Zantac treats stomach acid, Toprol treats hypertension, and Levothyroid treats hypothyroidism. Plaintiff testified that none of her medication helped her pain.

Plaintiff's back and knee pain continue to affect her sleep (Tr. at 638). She sleeps 2 to 2 1/2 hours a night (Tr. at 638). She is so tired during the day that she just blanks out (Tr. at 638).

Plaintiff has suffered from migraines for about ten years (Tr. at 639). Although she gets fewer migraines now, they are worse than before (Tr. at 639). She has a migraine about once or twice a month and they last for 12 to 13 hours (Tr. at 639).

Plaintiff has suffered from hallucinations since 2000 (Tr. at 636). Plaintiff does not leave her home unless she has to because she "can't be around people. . . . [I]t's like they're saying things about me and I get real paranoid, real scared. And then I hear things that aren't really happening, come to find out, and I act out on them very aggressively." (Tr. at 637). This has been happening since before she lost her last job, but she coped by staying away from crowds or people, "anything that I couldn't control." (Tr. at 637). She goes to the grocery store in the morning when there are few people there (Tr. at 646). Plaintiff shops once a month (Tr. at 647). Sometimes (but not often) she walks around the block, or she may walk on a walking track before it gets light out (Tr. at 647).

In June 2006 while working at the grocery store deli, plaintiff fell at work and filed a worker's compensation claim (Tr. at 634).

Since her last hearing, plaintiff was concerned about having to pay medical bills because she thought she might be "cut off" (Tr. at 639). This has kept her from going to the doctor because she is afraid she will have to pay the doctor back (Tr. at 640). Plaintiff testified she had not been going to the doctor because she misunderstood and thought she was not covered by Medicaid (Tr. at 640, 646). She knows now that she has to go to the doctor and get on her medication (Tr. at 646).

Since plaintiff stopped working in 2007, her weight has "gotten out of control" (Tr. at 641). Her weight at the hearing was 285 pounds (Tr. at 641). Plaintiff had gained about 100 pounds since before 2000 (Tr. at 641).

Before this hearing, plaintiff had an evaluation by a psychologist and she was there for almost two hours (Tr. at 641). Plaintiff was honest with the psychologist (Tr. at 641). She told him about hallucinations and does not know why he didn't include that in his report (Tr. at 650). Plaintiff hears voices from the other room when she is in her house (Tr. at 642). She cannot understand what the voices are saying, but she thinks the voices are talking about her: "she this she that" (Tr. at 642). Plaintiff takes a 1 1/2 hour nap in the morning and a 2 1/2 hour nap in the afternoon (Tr. at 642). Plaintiff can only be productive for a total of about an hour a day (Tr. at 642-643). She can only do anything for a total of 20 minutes at a time (Tr. at 643). She needs to rest both physically and mentally (Tr. at 643). She has trouble focusing and remembering (Tr. at 644). She thought Norman (apparently someone she had intended to call as a witness) had done something because the voices said he had, but he hadn't -- yet she beat him up (Tr. at 645). The only joy plaintiff has in her life is her 16-year-old son but he lives with his father (Tr. at 645). He has lived with his father for the past three years (Tr. at 649).

Plaintiff let her driver's license expire two years earlier (Tr. at 648). She was driven to the hearing by "a friend . . . that I've known for years" (Tr. at 648). Plaintiff prepares her own meals, does her own laundry (Tr. at 648). She let her garden go this year; a neighbor cuts her grass; she visits with one friend mostly on the phone; and when they get together, they watch movies and eat (Tr. at 649). Plaintiff watches news on television for about an hour in the morning and an hour at night (Tr. at 649). About once every month or two, people from her church come to her home and they all read the Bible together and she serves coffee (Tr. at

650).  This has been occurring for the past year; before that, plaintiff attended church services (Tr. at 650).

Plaintiff used to drink alcohol, but her last drink was "New Year's last year, maybe" (Tr. at 650).  When she had the altercation with her friend, she had had a few beers (Tr. at 651).

In the early 2000s plaintiff's husband would beat her until she was unconscious three or four times a week, sometimes more often (Tr. at 651).  That was another reason she stopped worked, "I couldn't go there all beat up" (Tr. at 651).

**Vocational expert testimony.**

Plaintiff's past relevant work includes skilled work as an assistant restaurant manager, skilled work as a pizza cook, semi-skilled work as a retail cashier, and unskilled jobs (Tr. at 652-653).

The first hypothetical involved a person able to lift 20 pounds occasionally and 10 pounds frequently; could stand or walk 2 hours per day; could sit for 6 hours per day; is limited in his ability to cope with stress; would not be able to carry out a job requiring fast-paced activity or a job requiring the person to meet strict and explicit quotas, deadlines, or schedules; would not be able to sustain a high level of concentration and so could not be required to perform precision work or work that requires a sustained attention to detail.  The person could sustain a simple routine or a simple, repetitive tasks. The person should not be required to interact personally with the public or have close personal interaction with coworkers. Supervision should be only incidental to the work performed (Tr. at 653).  Mr. Lala testified that such a person could work as an assembler of plastic hospital products, an unskilled job, with 2,400 in the state and 235,000 in the country (Tr. at 654). The person could work as a bench assembler, an unskilled job, with 1,400 in the state and 117,000 in the

country (Tr. at 654). These are both light level jobs that would permit a person to alternate sitting and standing as needed (Tr. at 654).

If the person in the first hypothetical needed to be redirected to his work on a frequent basis due to a lack of concentration, the person could not work (Tr. at 655).

The next hypothetical involved a person who could only produce about half as much as the typical person (Tr. at 656). Although this limitation would erode the available job base, it would not preclude employment (Tr. at 656).

A GAF score of 50 or below vocationally means that the person could not hold a job (Tr. at 657).

## C.    SUMMARY OF MEDICAL RECORDS

On January 6, 1996, plaintiff was seen at Cox Medical Centers approximately 2 months before the birth of her child (Tr. at 344). She weighed 270 pounds.

On January 22, 1996, plaintiff saw John Powell, M.D., for abdominal pain during pregnancy (Tr. at 332-335, 340-343). "She quit smoking three years ago. She denies any alcohol or drug use. . . . She denies seizure disorder."

On March 13, 2001, plaintiff weighed 280 pounds (Tr. at 202).

On July 30, 2001, plaintiff weighed 280 pounds (Tr. at 203).

On January 3, 2002, plaintiff was seen by Shirley Eyman, M.D. (Tr. at 237-241). Her chief complaint was, "I had some kind of attack." Plaintiff had left her husband and was staying with her son at Russell House and the second night there had a nightmare about her husband coming through a window to get her. She was crying and shaking and the staff at Russell House asked her to go to the emergency room. The staff at the emergency department "were talking about having her come up to the Center for Psychiatric Services and she got very frightened and upset." Plaintiff admitted having a history of depression and said she had

recently been taking Prozac but ran out of it a couple weeks earlier. "While she was taking the Prozac she thinks her depression was under good control and she wasn't having depressive symptoms although she was upset about her husband's abusiveness." After running out of Prozac she began having insomnia, anorexia, fatigue, crying spells, poor concentration, and feelings of being overwhelmed "although she denies ever having had any suicidal ideation" and she specifically denied suicidal ideation on this date. Plaintiff did report a history of panic attacks. She said she had given birth to two children but "lost one baby". Plaintiff was unemployed -- several months earlier she lost her job after her husband wrecked her car and she lost her ability to get to work. "The patient reports that she uses alcohol about once a month. May have 4-5 drinks and she denies any withdraw[al] symptoms. She denies using any other drugs." Plaintiff reported never having seen a psychiatrist and never having any prior psychiatric hospitalizations, although she had seen family doctors who prescribed medication for depression. "Prozac helped her a lot." Plaintiff was assessed with major depression, recurrent moderate; rule out histrionic personality;[4] and GAF of 55. Dr. Eyman prescribed Prozac and Desyrel for sleep. "She will participate in individual and group psychotherapy."

Plaintiff was discharged six days later, on January 9, 2002. The Prozac worked well for her. Her mood improved, her sleep improved, and she continued to deny suicidal ideation. On discharge she was free of suicidal ideation, free of depressive symptoms.

---

[4]Symptoms include constantly seeking attention; excessively emotional, dramatic or sexually provocative to gain attention; speaks dramatically with strong opinions, but few facts or details to back them up; easily influenced by others; shallow, rapidly changing emotions; excessive concern with physical appearance; thinks relationships with others are closer than they really are.
http://www.mayoclinic.org/diseases-conditions/personality-disorders/basics/symptoms/con-20030111

On March 4, 2002, plaintiff saw Bruce Harms, a licensed clinical social worker (Tr. at 248-254). "[T]he information pertaining to her addiction and the situation associated with the death of her daughter [at birth in 1994] seemed unclear." Plaintiff had gone back to live with her husband after her January hospitalization because in late January her husband was hospitalized at the Neuropsychiatric Unit "and also because Division of Family Services had been involved with their children since late January to early February, due to her husband's failure to take the children, a 14 year old step son, a 12 year old step son, and a six year old son, to school. The client stated she wanted to eliminate Division of Family Services involvement in their lives, so she returned to live with her husband." Plaintiff reported daily depressed mood, diminished ability to concentrate, fatigue most every day, difficulty falling or staying asleep, feelings of worthlessness, and symptoms of post-traumatic stress disorder. These symptoms had been present for the past two years or maybe longer. She also reported significant weight gain since 1996. Plaintiff reported angry outbursts, mostly verbal and some physical, and difficulty concentrating for at least six years and probably closer to eight or nine years.

Plaintiff said her husband had tried to commit suicide by drinking a lot of alcohol, taking a lot of pills and trying to poison himself with carbon monoxide. Her relationship with her husband had improved recently.

> She . . . described having difficulty with her anger. She stated that she has difficulty controlling her anger, and has had several verbal outbursts that are out of proportion to the triggering events, mostly involving her husband. She stated that she nearly did serious damage to a 16 year old niece two to three months ago. She stated that she was very angry during the New Year's Eve party [two days before her hospitalization], and almost hurt several people there before her husband pushed her down and she hit her head. She also described several incidents of, in her words, 'out of control' anger in her life.

> Plaintiff reported that she started smoking marijuana at age 13 and started drinking alcohol at age 15. She used both substances on a daily basis until August of 1992 (when she

was 33 years of age).  Since that time she has occasionally smoked marijuana and used alcohol. "She stated that the last time she drank was New Year's Eve in 2001 [or approximately two months ago].  She stated that she always used drugs or drank alcohol in order to get drunk or stoned. . . .  She stated that she  had tried acid, cocaine, and mushrooms in her late teen years, for a period of approximately two and a half years, but stopped using them thereafter.  When asked if she felt she had a drug and alcohol problem, she stated that she did, but it was in the past."

Plaintiff stated that her eight-year marriage had suffered from the beginning "by outbursts of physical and emotional abuse by both her and her husband, aimed one towards the other.  She stated that she has had difficulty controlling her anger, due to the fact that her husband regularly assaults her."  Plaintiff was arrested for domestic violence "at least once, six years ago. She also reported some other arrests resulting in time spent in jail, but stated that she was never charged.  She indicated that she was trying to get a job in the Mt. Grove area as a typist, but could not get the job because there was a record on file of her incarceration. . . . She indicated that she has hired an attorney to get rid of her file."

Plaintiff reported some difficulty in school "as a result of her alcohol and drug use. She did not describe any other cognitive or physical limitations to learning."  Plaintiff is a few hours short of having an Associate's degree in business, and she completed a course in daycare management in 1989.

A mental status exam was performed.  Mr. Harms assessed major depressive disorder, recurrent, severe, without psychotic features; intermittent explosive disorder; post traumatic stress disorder; alcohol dependence by history; and a GAF of "40 to 50."  The diagnoses were based on plaintiff's "statement" of symptoms.  "The client indicated that she is at a low risk for harming herself or others."

On April 2, 2002, plaintiff saw Colleen Brill, a registered nurse, for a psychiatric evaluation after having been referred by Mr. Harms (Tr. at 255-257). Plaintiff reported having suffered with depression since 1994. Plaintiff had reconciled with her husband "[b]asically because Division of Family Services was going to take his children whom she has raised. She says they are about to lose the house and are having a lot of financial problems." Plaintiff reported only sleeping about four hours per night and having a low energy level, daily crying spells, and mood swings. "She denies any suicidal thoughts at present, but does indicate she had some of these after baby died [in 1994]." Plaintiff said that on New Year's Eve her husband tried to choke her. Plaintiff reported memory problems, episodes where she will clean for 2 or 3 days without stopping and then get very tired, and "panic attacks that may be possibly related to her thyroid and has been on thyroid medicine and since then has been fairly well controlled with this." Plaintiff reported feeling anxious around other people and going to the emergency room three times from hives caused by nervousness.

Plaintiff said that after her baby died she tried to commit suicide. "She took a gun out back and sat and contemplated this for about five hours and then decided not to." Plaintiff said she had had two miscarriages due to physical abuse. Plaintiff's last drink was on New Year's Eve. "About nine years ago she reportedly had a problem for about five of six years where she was drinking 1.75 liter a day of hard liquor." Her last use of marijuana was five or six years ago, and she was smoking it every day. She reported having tried methamphetamine, LSD, and speed 15 to 20 years ago. Plaintiff was smoking 5 cigarettes per day.

Ms. Brill prescribed Zoloft and Trazodone and told plaintiff to come back in a month.

On April 23, 2002, plaintiff returned to see Colleen Brill, MSN, RN (Tr. at 258). Plaintiff reported sleeping 6 hours a night with Trazodone. "She is back to work and doing well." Plaintiff said she was a little irritable but she was not feeling depressed and her energy

level was high.  "She reports feeling anxious at times and said that she saw her grandmother's watch in the pawn shop [and] went ballistic and they had to call the police."  Plaintiff reported that she was enjoying her life and was able to do her activities of daily living.  She denied suicidal thoughts.  She and her husband were getting along better since he went to rehab although he left early.  Ms. Brill observed that plaintiff's affect was bright, she was well groomed, and she exhibited slightly pressured speech.  Her Zoloft was increased, and she reported no side effects with that medication.

On June 10, 2002, plaintiff returned to see Ms. Brill (Tr. at 260).  Plaintiff said her husband "left last night after drinking and he took the children."  Plaintiff had been extremely upset and crying since then.  Plaintiff "ha[d] an accident at work yesterday.  she indicates she came home, found him drunk in the shop, and when she woke up from a nap she found he had taken the children and left.  He did leave her son with her, however his children from previous relationships that she had raised he took with him.  She also indicates, 'He destroyed my vehicle.'"  Plaintiff was observed to be extremely distraught and tearful.  She was able to discuss her feelings and she appeared "more calm and her affect is brighter upon leaving."  She was continued on the same doses of Zoloft and Trazodone.

On June 12, 2003, plaintiff weighed 296 pounds (Tr. at 204).

On December 4, 2003, plaintiff saw Michael Hagaman, M.D., who increased her hypertension and thyroid medications (Tr. at 189).  Plaintiff weighed 286 pounds.

On December 15, 2003, plaintiff saw Dr. Hagaman who noted that plaintiff had lost about 30 pounds in the last month and was currently 279 pounds (Tr. at 206).  "She's been on the Atkins diet."

On June 14, 2004, plaintiff weighed 277 pounds (Tr. at 208).  She saw Dr. Hagaman and complained of dizziness and lightheadedness over the past couple of weeks when bending

over.  She was working at a day care.

On October 15, 2004, plaintiff saw Dr. Hagaman (Tr. at 209).  "[C]omes in today feeling bad, crying, not sleeping."  Plaintiff had been going through a divorce for the past 2 1/2 years and was having a difficult time with it.  She weighed 290 pounds.  Dr. Hagaman prescribed Lexapro.

On November 3, 2004, plaintiff was seen by R. Stephen Austin, M.D., for a Medicaid review (Tr. at 348).  "Based on review of the client and current clinical information treatment is considered medically and psychiatrically necessary at the present time."

On November 22, 2004, plaintiff was seen by Dr. Austin for depression (Tr. at 349-351).  Plaintiff was working at a preschool and was very happy with her job.  Plaintiff said she had been going through a divorce for the past 2 1/2 years and it had almost gone through "when they found a typographical error which threw the whole thing out."  Plaintiff reported being the youngest of four girls and "always felt as if she was the add-on element."  (However, in other medical records plaintiff said she was the third child with a sister several years younger.)  Plaintiff said she was "always at the bottom apparently of the love chain."  Plaintiff said that about every third or fourth day she would get depressed and "wondered if she was going to lose it."  She was sleeping about 4 hours per night.  Her energy level was erratic.  Plaintiff reported enjoying going with her son to watch him shoot hoops, and she would "chase the balls down" when they left the court.  She reported that her attention span was okay.  She reported that her mother and a sister have bipolar disorder, although in other medical records plaintiff reported no family history of mental health problems.  Plaintiff had been off her Lexapro for about a week and noticed that her crying spells had restarted.  She reported being an occasional drinker. She said she smoked marijuana for the last time 15 years earlier and that she quit smoking a year ago.  Plaintiff was alert and oriented times three.  Her personal

hygiene was good. She was pleasant and cooperative, polite, appropriate, and motivated for treatment. Behavior was spontaneous and well organized. Psychomotor activity was within normal limits. She denied auditory and visual hallucinations. She had a sad mood and affect, and she teared up for about 30 seconds. Eye contact was good. Speech was normal. She never had any flight of ideas or racing thoughts. Intelligence was estimated at above average. "Memory for long-term, short-term and recall are within normal limits. Attention span tests okay. Insight and judgment are fair." Dr. Austin assessed dysthymic disorder, anxiety disorder not otherwise specified, and personality disorder not otherwise specified, with a GAF of 50. He prescribed Lexapro and Trazodone.

On January 12, 2005, plaintiff saw Dr. Hagaman for a well-woman exam (Tr. at 210). She weighed 279 pounds. He refilled her Lexapro at the same dose.

On January 14, 2005, plaintiff saw Dr. Austin for a group medical review/treatment update (Tr. at 353-354). Plaintiff reported problems sleeping. "During the group she found out one of the other clients also had problems with a DHS worker in Missouri and she exploded a little bit and said she had the same problem and that she had a good lawyer she could refer the other client to and actually got together after the group and exchanged phone numbers for that to happen." Plaintiff was alert and oriented times three. She denied auditory and visual hallucinations, she denied suicidal ideation. Her mood and affect were slightly depressed. She was assessed with a GAF of 50. Her Trazodone was increased to help her sleep and her Lexapro was continued.

On March 23, 2005, plaintiff saw Dr. Hagaman and reported that her nerves were "giving her a hard time" (Tr. at 211). She was having trouble sleeping. "Going back to court w/her ex-husband. Tearful in clinic." She weighed 273 pounds. Dr. Hagaman gave plaintiff samples of Zoloft and a prescription for Elavil to take at night. "She has no money and really

can't afford to get anything filled."

On April 1, 2005, plaintiff saw Dr. Austin for a medication review/treatment plan update (Tr. at 355). Plaintiff said she did not do well on the Lexapro, and one of her doctors put her on Zoloft about two weeks ago. She stopped taking the Trazodone because it did not work. "I am going to put her back on it at 200 mg at bedtime and see how she does. I am also going to give her Ambien 10 mg at bedtime for a short while. She does not have any side effects to her medication." Plaintiff was alert and oriented times three. She denied hallucinations and suicidal ideation. Mood and affect were slightly depressed. She was assessed with a GAF of 50.

On May 25, 2005, plaintiff saw Dr. Austin (Tr. at 352). "Caralee comes in today and states she has been through a very bad period the last six weeks. She called about four weeks ago to make this appointment. She did turn in some child abusers but it all backfired on her as they have all come back on her. She had the police called on her three times in one night even when she had not done anything. Apparently she was put in jail for 4-5 hours. She called her ex-husband in North Carolina who actually bailed her out. She seems to be having quite a bit of a problem with any kind of authority. She seems to be doing well on her medication." Plaintiff was alert and oriented times three. She denied visual or auditory hallucinations, and she denied suicidal ideation. Affect and mood were observed to be euthymic. She was assessed with a GAF of 50. Dr. Austin prescribed Zoloft, Trazodone, and Ambien (treats insomnia).

On July 11, 2005, plaintiff saw Dr. Hagaman and requested a "Depo shot[5] for her cycles" (Tr. at 212). "She is in a real mess right now. Her child was taken away from her and

---

[5]Depo-Provera is a birth control method for women. It is made up of a hormone similar to progesterone and is given as an injection by a doctor into the woman's arm or buttocks. Each shot provides protection against pregnancy for up to 14 weeks, but the shot must be received once every 12 weeks for the patient to remain fully protected against pregnancy.

she is currently living in the Gamma House. She is having a lot of stress and anxiety. Her BP is 142/102 and she continues to smoke." Plaintiff was not taking her Toprol or Lisinopril, both for hypertension. Dr. Hagaman gave her samples of Toprol and gave her a prescription for Lisinopril "which she can get filled at the Christian Clinic. . . . If she would stop smoking and get her blood pressure down in good control, then we will have no problems putting her on the Depo shot."

On October 24, 2005, plaintiff saw Sandra Haslauer in Dr. Austin's office (Tr. at 356-365). Her last contact with this office was noted to have been May 25, 2005. She said she was depressed, was trying to get divorced, and was having panic attacks. "[She] did not follow thru w[ith] the recommendations; last seen 5/25/05; cancelled last 3 appointments." She said she had been sober since November 7, 2003, and that before then she was drinking a pint of alcohol per day. Plaintiff reported that she was depressed, trying to get divorced, had problems sleeping, mood swings, anxiety. She said she gets confused and overwhelmed and has no emotional support. Her symptoms had been on and off since November 2003. She was experiencing panic attacks. She had recently gone back to school to study early childhood development. Plaintiff said her biggest fear was that her husband would get custody of their son. She reported decreased concentration and focus, weekly mood swings, regular difficulty going to sleep. Plaintiff was described as cooperative, well groomed, with clear speech. She did not report any aggressive behavior or hallucinations. Her thought process were logical. She was depressed, anxious and irritable with a flat affect  Her judgment and insight were good. Her memory was normal (long and short term). Her attention was normal, concentration was diminished. She had good judgment and insight. Plaintiff was assessed with bipolar I disorder, panic disorder, and personality disorder not otherwise specified. She was prescribed Zoloft, Trazodone and Ambien.

On January 23, 2006, plaintiff saw Dr. Hagaman for medication refills (Tr. at 213). "She just got insurance. She basically has not been on any of her meds." Plaintiff continued to smoke a half a pack of cigarettes per day. Plaintiff weighed 254 pounds. Dr. Hagaman prescribed Paxil in addition to plaintiff's hypertension and thyroid medications.

On February 16, 2006, plaintiff saw Mary Burr, a nurse practitioner (Tr. at 214). Plaintiff weighed 252 pounds.

On March 20, 2006, plaintiff saw Dr. Hagaman and reported trouble sleeping "as she is going through a lot of stress with legal issues" (Tr. at 215). Plaintiff weighed 259 pounds. He prescribed Trazodone to help her sleep and he continued her on Paxil.

On June 2, 2006, plaintiff went to the emergency room after falling at work (Tr. at 193-199, 224-226). She said she "did the splits" and was suffering pain in her lower back, right knee and shoulder. She did not lose consciousness. Under her past medical history she reported arrhythmias, hypertension and thyroid problems but no stroke. She was smoking 1 1/2 packs of cigarettes per day and reported occasional alcohol use. She was alert and oriented times three and was described as pleasant and in no acute distress. She was taking no medication for any mental condition. On exam she was noted to have "a little bit of discomfort" in the shoulder but with full rotation and a normal knee with no fracture. X-rays of the shoulder were normal. X-rays of the knee showed "some mild degenerative changes." X-rays of the lumbar spine showed "moderate degenerative disc change at L4-L5" but no acute changes. Melissa Quevillon, M.D., recommended ibuprofen and "she can take some Ultram" as needed.

On June 5, 2006, plaintiff saw Gregory Elders regarding a worker's compensation evaluation for Town and Country Supermarket (Tr. at 216). Plaintiff reported working 16 hours a day in two jobs. She had finished her prescription for Ultram. "She is able to walk

now and did work today without difficulty." Plaintiff had full range of motion in her knee. "Okay to return to work. . . . Return to full duty."

On July 8, 2006, plaintiff saw Christiana Thompson, a nurse practitioner (Tr. at 217). "47-year-old who presents today for her 'nerves'. This very pleasant lady lost a good friend yesterday in a terrible motorcycle accident. . . . She is very upset and understandably stressed. We talk[ed] at length about the grieving process and how difficult it is to lose a friend or family member from trauma. She knows that there are grief services available in the area. . . . There is no indication today of suicide ideation as this is just normal grief response." Shew as assessed with stress and anxiety associated with grief response. She was prescribed Xanax, 20 pills with one refill only.

On August 30, 2006, plaintiff was seen at Mountain Home Christian Clinic ("MHCC") and reported smoking 1+ packs of cigarettes a day for 30 years and consuming alcohol occasionally.

On September 7, 2006, plaintiff saw D. Riley, a physician's assistant at MHCC for a refill of her medications (Tr. at 188). She complained of her leg swelling. She weighed 249 pounds. She was diagnosed with hypertension, hypothyroid, and GERD.

On January 4, 2007, plaintiff saw Dr. Hagaman (Tr. at 218). Plaintiff reported almost passing out due to cough, congestion and shortness of breath. "She continues to smoke. She cannot afford her inhalers or antidepressants secondary to not having any money. However, she is able to continue to buy her cigarettes. She has been off her Paxil for some time. She is again tearful and depressed. She wants to go back on this." Plaintiff weighed 261 pounds. Dr. Hagaman assessed COPD. "She needs to be on the albuterol, however, she cannot afford this. I do talk with her about possibly stopping her cigarettes and she might be able to afford some of these medications. She is going to think about that. I also recommend seeing us at the

Christian Clinic, which I also work at. We provide medication, which would benefit her." He gave her samples of Spiriva for COPD. He refilled her Paxil and told her to get that prescription filled at the Christian Clinic.

April 4, 2007, is plaintiff's alleged onset date. This is also the date she alleges she was in a terrible car accident that resulted in her inability to work. There are no records of any car accident. She completed her application for disability benefits on August 6, 2007.

On August 26, 2007, plaintiff was seen in the emergency room (Tr. at 231-232). When asked about her past medical history, she reported hypertension and toe issues, but she did not report a history of stroke, and she did not report having been in a terrible car accident four months earlier. She was smoking a pack a day and reported no alcohol consumption for the past 10 to 12 years.

On September 20, 2007, plaintiff was examined by Hassan Najeeb Albataineh, M.D., in connection with her disability application (Tr. at 261-268). Plaintiff reported she had heart arrhythmias and could walk one block without chest pain. She reported depression and anxiety. She weighed 243 pounds. On exam her heart, lunch, abdomen, neck, skin and spine were all normal, including her range of motion. She had no detectable muscle spasms. Straight leg raising was normal. Her range of motion was normal everywhere except her knees where she had 120 degrees of flexion with 150 degrees being normal. She had no joint abnormalities. Muscle strength was normal and she had no muscle atrophy. Gait and coordination were normal. Tandem walk was normal. She was able to hold a pen and write, grip, stand and walk without assistive devices, squat and arise from a squatting position. She was oriented to person, place and time. She showed no evidence of psychosis or serious mood disorder. X-rays of her lumbar spine and right knee were normal other than degenerative

changes.  Based on his examination, Dr. Albataineh found that plaintiff had "mild limitations [in her] ability to walk, lift & carry."

On October 16, 2007, plaintiff was evaluated by Terry Efird, Ph.D., in connection with her disability application (Tr. at 278-284).

> When asked about reasons for applying for disability, the claimant reported "first of all my knees keep popping out; and, I drop down.  I can't remember anything anymore." When asked about other mental/emotional symptoms, claimant reported "depression and post traumatic stress."  Claimant was interviewed for criteria for major depressive disorder.  Mood was described as "I don't wake up depressed. Everything just doesn't seem to work out."  This was described as occurring daily for about the past year. . . .  A problem with sleep onset . . . was reported, with ruminative thoughts. Energy level was described as "not real low" - "I do everything I have to do." . . .  A problem concentrating was reported (e.g., "everything is just a mess").  Claimant denied suicidal ideations.

> . . . Symptoms of increased arousal endorsed included problems with sleep onset; difficulty concentrating; hypervigilance; and, an exaggerated startle response. These symptoms have reportedly been occurring at least since 2003. They cause significant distress; and, impair social functioning. . . .  Symptoms have reportedly become worse in the past year.

> The claimant reported receiving outpatient mental health services for about one year in 2003.  The response was described as "I felt better when I left there.  I had more hope." Claimant did not bring medications to this evaluation. She reported being prescribed Celexa 20 mg QD.  This medication is reportedly prescribed by her PCP; and, has been prescribed for about five months. It is reportedly taken as prescribed; and, claimant denied noticing any effects.  A possible side effect of headaches was reported. Financial obstacles to treatment were reported.

> Claimant presently lives in a homeless shelter, with her son. They have lived in this setting for about two months. Claimant reported the ability to perform ADL's satisfactorily. . . .  Legal and military histories were denied.  She did report some hot check charges earlier this year, which was influenced by a banking error.

> Claimant has reportedly worked primarily as a cook in restaurants and bakery. She reportedly last worked in February, 2007. She quit this job at a pizza place at that time, secondary to having been working 10 hours per day, 7 days a week. She reported working some odd jobs, cleaning houses or lawns since that time.  Relationships with coworkers and supervisors were described as having typically been satisfactory. However, she was fired from one job secondary to not getting along with her supervisor, within the past year.

Claimant denied the use of illegal substances. She did report smoking marijuana until about three years ago. Regarding alcohol usage, claimant reported drinking a beer about twice a year.

Plaintiff was observed to be cooperative and appropriately dressed and groomed. Her mood was sad and anxious. Affect was appropriate to content with tearful affect noted. Thought processes were typically logical, relevant and goal-directed. Suicidal ideations were denied. "Distinct visual and auditory hallucinations were denied. Claimant did report believing she hears people talking at times, at night. This was described as unclear. This type of experience reportedly began about 4-5 months ago; and, reportedly occurs about twice per week." Plaintiff was oriented to person, place and time. She readily produced basic personal demographic information. She recalled past presidents, large cities, states bordering Arkansas. Her fund of general information "appeared consistent with probably low average intellectual functioning."

Claimant also talked about problems with memory. However, no remarkable problems with memory were noted during this evaluation. Claimant also reported believing that she hears voices. However, she is unable to make out the words. These experiences do not appear to be clearly psychotic, and possibly associated with the mood disorder and environment.

Dr. Efird assessed major depressive disorder, moderate to severe; post-traumatic stress disorder, chronic, and a GAF of 42-52.

The claimant denied driving since April 4, 2007. She had an MVA [motor vehicle accident] at that time; and, did not renew her driver's license. Claimant reported the ability to shop independently; and, reportedly walks to a nearby grocery store. Claimant related the ability to handle personal finances. Socially, claimant reported going to church twice a week; and, seeing a friend about twice per month. Claimant reported the ability to perform most ADL's satisfactorily.

Claimant appeared capable of adequate and appropriate communication during this evaluation. Claimant essentially interacted in an intelligible and effective manner.

The claimant performed serial threes satisfactorily; and, recalled two of three items after an approximately five minute delay. Other cognitive tasks were performed satisfactorily. Therefore, in terms of basic cognitive tasks, this claimant appears to be able to function adequately.

Claimant appeared able to sustain attention/concentration adequately for the purposes of this evaluation. She was able to track and respond to shifting demands of this evaluation.

In general, this claimant appeared to sustain persistence satisfactorily during this evaluation. Some encouragement was offered at times.

The claimant did not display remarkable slowing during this evaluation. Claimant completed tasks within a reasonable time frame.

Formal validity assessment techniques were not employed. It was not my clinical impression that the claimant remarkably exaggerated severity of reported symptoma[to]logy. Cognitive tasks were performed fairly consistent with estimated intellectual functioning. Adequate effort was noted during this evaluation. I did not detect any remarkable evidence of malingering and the present results are viewed as likely representing a valid estimate of current functioning.

On October 17, 2007, Paul Cherry, Ph.D., completed a Psychiatric Review Technique (Tr. at 286-299). He found that plaintiff suffers from major depressive disorder, moderate to severe, and anxiety. He found that plaintiff suffers from moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. In support of these findings, Dr. Cherry wrote in part as follows: "Records showed that she responded well to Prozac, and the abuse from her husband was also a major factor leading to the admit.... Notes show she was married to a physically abusive husband, and she has a hx. of alcohol abuse. She has been followed as an outpatient through individual and group therapy.... Clt is not currently being seen for any formal mental health tx. She stated that she currently takes Celexa.... She currently resides in a homeless shelter with her son, and she is able to perform her ADLs satisfactorily.... She had adequate fund of general knowledge with no clear memory problems based on her responses and the doctor's observations. Concentration, pace, and persistence were adequate."

That same day, October 17, 2007, Dr. Cherry completed a Mental Residual Functional Capacity Assessment (Tr. at 300-302). He found that plaintiff was not significantly limited in

the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that she was moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

31

- The ability to respond appropriately to changes in the work setting

He concluded with the following: "Clt retains the ability to perform simple and routine work activities."

On January 16, 2008, Vann Smith, Ph.D., completed a neuropsychological evaluation in connection with plaintiff's application for disability benefits (Tr. at 318-322). Dr. Smith had requested plaintiff's medical records but they had not been reviewed at the time the report was written.

> The patient is referred, by her attorney, for formal neuropsychodiagnostic evaluation, in support of an ongoing application for Social Security Disability benefits. She presents with a history of worsening neurocognitive symptoms including: 1) impaired recall memory, 2) impaired attention to sequential detail, 3) dysexecutivism, 4) word finding difficulty, 5) sleep pattern disturbance and 6) affective lability.

Plaintiff reported a history of seizure disorder, even though there are no medical records suggesting seizure disorder and plaintiff specifically denied seizures in many of her treatment records. Plaintiff described her physical pain as an 8 out of 10. "She related a history of multiple closed head injuries (MVAs and alleged assaults by spouse) and at least one incident of being 'choked' to unconsciousness. . . . She is a non-drinker who smokes one pack of cigarettes per day."

Dr. Smith performed a neurocognitive status examination which revealed a well groomed, alert, cooperative, polite patient oriented in all spheres. "Her memory was impaired. Her judgment and insight were intact. . . . Her native intelligence was estimated to lie within the normal range." Dr. Smith performed a battery of tests and determined that plaintiff's full scale IQ was 105.

> In overview, this patient's clinical history, mental status examination and neuropsychodiagnostic screening test profile data reveal a pattern of diffuse organic brain dysfunction. The pattern of abnormal findings observed across this patient's neuropsychodiagnostic test profile is similar to that seen commonly in association with: 1) cerebrovascular, hypoxic, toxic or metabolic encephalopathies, 2) traumatic brain insult and the sequelae thereof and 3) the dysregulation of key central neurochemistry

(eg. Serotonin, GABA, Acetylcholine, Norepinepherine) believed now to be precipitated by the brain and spinal cord's adaptive response to chronically painful disease process (eg. DJD [degenerative joint disease], DDD [degenerative disc disease], Fibromyalgia, Myalgic Encephalomyelitis, Syringomyelia, Peripheral Neuropathies). Resulting neurocognitive symptoms (impaired memory, impaired attention, dysexecutivism, affective lability, "depression", sleep pattern disturbance, etc.) interfere significantly with the patient's capacity to carry out routine daily activities in a consistent manner. This renders the patient, in my clinical opinion, disabled at this time.

In summary, this patient's clinical history, mental status examination and neuropsychodiagnostic screening test profile data, reveal a pattern of abnormal findings consistent with the diagnosis(es) of:

1.      Cognitive Dysfunction, Non-psychotic, Secondary to General Medical condition(s)*

        * TBI (Multiple) with Grade III concussion, per patient history.
        * DJD [degenerative joint disease], per patient history.
        * HTN [hypertension], per patient history.
        * Hypothyroidism, per patient history.
        * Cardiac dysrhythmia, (PATs) per patient history.
        * Seizure Disorder, per patient history.
        * Chronic, Multifocal, Non-psychogenic, marginally controlled, pain.

On January 28, 2008, Dr. Smith completed a Mental Functional Capacity

Questionnaire (Tr. at 323-327). Dr. Smith wrote "294.10" as his Axis I assessment.

According to DSM-IV, a diagnosis of 294.10 means one of three things: "Dementia Due to

[Indicate the General Medical Condition], Without Behavioral Disturbance," "Dementia of the

Alzheimer's Type, With Early Onset, Without Behavioral Disturbance," or "Dementia of the

Alzheimer's Type, With Late Onset, Without Behavioral Disturbance." He assessed her GAF as

40 to 80; however, the words "past year" were scratched out and what he wrote instead is

illegible. Her prognosis was "fair." Her signs and symptoms were noted to be decreased

energy; difficulty thinking or concentrating; psychological or behavioral abnormalities

associated with a dysfunction of the brain with a specific organic factor judged to be

etiologically related to the abnormal mental state and loss of previously acquired functional

abilities; emotional lability; easy distractibility; memory impairment - short, intermediate or long term; and sleep disturbance.

He found that plaintiff's abilities were limited but satisfactory in the following:

- Understand and remember very short and simple instructions

- Make simple work-related decisions

- Ask simple questions or request assistance

- Interact appropriately with the general public

- Maintain socially appropriate behavior

- Adhere to basic standards of neatness and cleanliness

He found that plaintiff's abilities were seriously limited but not precluded in the following:

- Carry out very short and simple instructions

- Work in coordination with or proximity to others without being unduly distracted

- Accept instructions and respond appropriately to criticism from supervisors

- Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes

- Respond appropriately to changes in a routine work setting

- Deal with normal work stress

- Be aware of normal hazards and take appropriate precautions

- Travel in unfamiliar place

- Use public transportation

He found that plaintiff was unable to meet competitive standards in the following:

- Remember work-like procedures

- Maintain regular attendance and be punctual within customary, usually strict tolerances

- Sustain an ordinary routine without special supervision

- Complete a normal workday and workweek without interruptions from psychologically based symptoms

- Perform at a consistent pace without an unreasonable number and length of rest periods

- Understand and remember detailed instructions

- Carry out detailed instructions

- Set realistic goals or make plans independently of others

- Deal with stress of semiskilled and skilled work

He found that plaintiff would be likely to miss work more than four days per month due to her impairments or treatment.

Plaintiff did not present any treatment records for 2008 until November 2 of that year. On November 2, 2008, plaintiff went to the emergency room complaining that her leg was itching all the time (Tr. at 588, 598).

On November 11, 2008, plaintiff was in jail[6] and was "talking incessantly regarding delusions of others poisoning her (Tr. at 379-380, 384). She reportedly was restless and pacing. She was reportedly grandiose stating, 'I have more degrees than you do.'" (Tr. at 367-604). Plaintiff wound up having a psychiatric assessment (Tr. at 372).

Plaintiff reported having a masters degree in early childhood education (Tr. at 367, 390). However, she reported that she was disabled and was receiving SSI and SSD (Tr. at 390). She was living in a home with her spouse (Tr. at 368). She said she had been seeing a psychiatrist privately until 1 1/2 years ago when she had a car accident and lost her job (Tr. at 372). She had not been taking any medication for any condition, mental or physical, since March 2008 (Tr. at 389). Plaintiff said she had recently learned that her middle son was using

---

[6]The charge is illegible but it was marked as a misdemeanor (Tr. at 372).

methamphetamine with his father and had been since April 2008, which caused her to become extremely stressed landing her in the hospital (Tr. at 450-451, 453). Elsewhere in the records, plaintiff indicated that she had gone to the hospital due to a nose bleed (Tr. at 450). When she was at the hospital, "they" would not allow her contact with her youngest son (Tr. at 451). "Pt reports becoming loud, verbally abusive & threatening staff. Pt states that she was taken to 'lock up' & screened by Ozark Counseling Services." (Tr. at 451). Plaintiff said she has been diagnosed with post traumatic stress disorder, bipolar disorder, and paranoid schizophrenia (Tr. at 451). "During the session, patient was a good historian. Cooperative & maintains good eye contact." (Tr. at 451).

Plaintiff denied anxiety or depression, but reported symptoms of mania (Tr. at 374, 384, 388). Plaintiff reported a history of post traumatic stress disorder and obsessive compulsive disorder (Tr. at 388). Plaintiff reported having taken a shot of whiskey (Tr. at 374). "She reports she drank Crown Royal last week. She use[d] to pass out when she drank alcohol." (Tr. at 453). Plaintiff said she had been diagnosed with post traumatic stress disorder and bipolar disorder. She said she did not know her phone number, had poor judgment, poor attention, poor concentration, and some insight (Tr. at 374). She denied prescription drug abuse, non-prescription drug abuse, illegal drug use, and alcohol abuse over the past 12 months (Tr. at 375). Her GAF was assessed at 35, and her diagnoses were anxiety, post traumatic stress disorder per client, and bipolar disorder per client (Tr. at 376).

Plaintiff agreed to be seen at Ozark Counseling Services and said she would walk to her appointments (Tr. at 374). Two days after her initial evaluation in jail, she was voluntarily hospitalized in the Arkansas State Hospital where she was treated by Linda Parker, M.D., a psychiatrist, and Natalie Strode, a case manager (Tr. at 369, 382). Her admission date was November 13, 2008 (Tr. at 384). According to the records, plaintiff was taken by ambulance

to the state hospital for a 72-hour hold prior to agreeing to be admitted (Tr. at 599). She was noted to be cussing a lot: "I can't believe these motherfuckers they tricked me, I'll get that nurse bitch, I'll see her again" (Tr. at 599). Plaintiff was noted to be angry, she wanted to go to Missouri to check on her children, and she refused Haldol (Tr. at 602).

On admission, plaintiff was observed to be neatly groomed, cooperative and pleasant with good eye contact (Tr. at 384, 390). Psychomotor status was normal "but could quickly become tangential and almost have flight of ideas" (Tr. at 384). Intellectual functioning appeared to be average based on vocabulary and syntax; recent and past memory appeared intact as she was able to give a chronological history (Tr. at 385). Plaintiff's physical exam was normal except she was obese (Tr. at 385). A drug screen was negative (Tr. at 385). "Psychological evaluations were ordered but were not able to be done prior to her discharge" (Tr. at 385). She was started on Risperdal for psychosis on November 17, 2008, and on November 25, 2008, her dosage was increased (Tr. at 385). Plaintiff participated in individual and group therapy during her stay (Tr. at 385).

During her stay, plaintiff was given tests to evaluate her mental condition, and she was given a physical examination (Tr. at 390-391, 398). She was tearful during various moments in the assessment "and with all the stressors she has it [is] most likely she is clinically depressed" (Tr. at 418). She denied back pain, but reported falls, arthritis, and chronic pain for which she was taking Aleve (Tr. at 409). She had normal strength in all of her extremities (Tr. at 398). She weighed 274 pounds (Tr. at 401). A suicide assessment shows that plaintiff denied history of suicide attempt or self harm (Tr. at 393, 411). Hallucinations were also denied (Tr. at 393). A violence risk assessment completed on November 13, 2008, shows that plaintiff did not display violence during previous admissions, she was not known to have displayed violence in the community, and she did not display extreme agitation or aggression

at the time of her admission (Tr. at 413). She was asked if she had ever been in a severe accident, and she reported that she was hit by a cement truck when she was a teenager (Tr. at 417). She was asked if she ever has flashbacks (she answered, "no"), nightmares (she answered, "no"), or whether she stays away from other people (she answered, "no") (Tr. at 417).

Plaintiff was smoking 1 to 2 packs of cigarettes per day (Tr. at 394). Her hobbies were horseshoes and computers (Tr. at 405). In the past six months plaintiff had spent a lot of time drawing and planting roses "with family and friends" (Tr. at 406). When asked whether she likes doing leisure activities alone, with just one other person, with 3 to 5 others, or with 6 or more people, plaintiff said, "with 3 to 5 others" (Tr. at 407).

Progress noted dated November 17, 2008, indicate that "Patient was told that DHS needed to discuss possibility of her 12 yr old son entering foster care. Conference call was made to Baxter Co. DCFS and it was agreed that the son would remain with their next door neighbor until patient is discharged from ASH [Arkansas State Hospital]." (Tr. at 455). Plaintiff reported that she was in severe pain and could not walk on her leg (Tr. at 455). Two days later, plaintiff participated in her first group therapy session and was noted to be "attention-seeking" (Tr. at 458). "Patient was intrusive in group both days as evident of 'talking while other patients are presenting their information, not really paying attention, or agreeing with everything said even if it not reality" (Tr. at 458). On November 22, progress notes state that plaintiff was "very somatic during the beginning of this week as evidenced by c/o headache, leg pains, nosebleed, panic attacks, needing her Bible, where are her personal belongings and who is going to take care of her things at home." (Tr. at 518). Plaintiff had begun to improve -- she was interacting with her peers better, had become more positive, learning to use coping skills more appropriately (Tr. at 518). Her blood pressure had been normal (Tr. at 518). On

November 23, plaintiff was noted to be cooperative with the staff, interacting appropriately with her peers, showing some insight into her surroundings (Tr. at 500).

In progress notes dated November 24, 2008, it was noted that plaintiff had arranged for her son's care (Tr. at 459). "Caralee still plans to return to her trailer after discharge -- she reported having been evicted, but says she has a lawyer who has worked out arrangements with her landlord. Only problem with a discharge is that Caralee still refuses to be referred to DCS for follow-up care. She wants to make other arrangements." (Tr. at 459). The following day, Dr. Parker noted that plaintiff "state[d] she was paranoid last night when she thought she was going to jail. She was jovial today but did become tearful as she talked about her husband." (Tr. at 459-460). Plaintiff denied suicidal thoughts; she denied medication side effects (Tr. at 460). On November 25, she was noted to be easily frustrated and overreacted when things were not at her request (Tr. at 504). On November 26, plaintiff participated in group therapy "activity and made positive contributions. Speech was relevant and coherent." (Tr. at 462). She was noted to have been cooperative and pleasant (Tr. at 506). On November 28 progress notes reflect that plaintiff "makes excuses for her choices/decisions. Pt has difficulty accepting positive advice." (Tr. at 510). On November 30, progress notes state that plaintiff "plays the victim role and can be very defensive when she disagrees" but was improving since she was assigned a new roommate (Tr. at 514).

Progress notes dated December 1, 2008, indicate that plaintiff was optimistic about her situation, she planned to return home after discharge (Tr. at 446). "She will need to work on communicating needs in reality based manner, as progress notes indicate attention seeking behavior and not being in reality." Plaintiff wrote, "I feel I'm in reality & this statement is false" before signing the form (Tr. at 446). The following day plaintiff "was very tearful during our session, stating that she was being evicted from her mobile home & all of their

personal items were being thrown in the dumpster. Pt. stated that they received only $395.00 per month total household income. Pt. stated that she wanted to be discharged today. Discussion of pro/con of patient being discharged AMA [against medical advice]. Several tel call to community supportive agencies to assist with rent, and talking with landlord about pt remaining within the mobile home until 12/15/08. DHS/DCFS sent a caseworker out to talk with the landlord about patient remaining in the mobile home." (Tr. at 465). Also on that day she went to the beauty shop to have her hair done and was crying out, "my nerves are bad and I'm itching" (Tr. at 519). She was given Haldol and Benadryl which were noted to be effective (Tr. at 519).

On December 3 she was noted to have participated in group therapy (Tr. at 462). She was friendly and cooperative, her speech was relevant and coherent (Tr. at 462). On December 5 and 6, plaintiff complained of agitation (Tr. at 463) but she was noted to be "less paranoid and agitated" on both those days as well as on December 8 (Tr. at 466, 468). Plaintiff was given Trazodone "per request for insomnia" and Haldol "per request for agitation" on December 6 (Tr. at 466).

Plaintiff was discharged in stable condition on December 9, 2008, with no restrictions on physical activity (Tr. at 386, 469, 535). "She is able to make general decisions, financial decisions and live independently (Tr. at 386). Her discharge medications were Risperdal and medications for hypertension (Tr. at 386). Her discharge diagnosis was mood disorder not otherwise specified (Tr. at 386). Her GAF score, which had been 33 on admission, was 55 on discharge (Tr. at 386). Her prognosis was guarded "due to poor coping skills and limited understanding of her illness and need for treatment" as evidenced by her failure to comply with treatment for the past year and a half (Tr. at 387 390).

The only pain medication plaintiff was ever given during her hospital stay was Tylenol (Tr. at 542-545). During those times, she rated her pain a 5/5 or a 4/5 (Tr. at 542-545). The day before her discharge her weight was 281 pounds (Tr. at 546).

There are no medical records from plaintiff's discharge on December 9, 2008, until March 5, 2010, fifteen months later. On March 5, 2010, plaintiff was seen at Ozarks Medical Center for fever, chills and cough (Tr. at 877-879). Plaintiff was a smoker. She was observed to be oriented times three with normal mood and affect. Chest x-rays were normal. She was prescribed Albuterol inhaler and was told to stop smoking. That same day plaintiff saw Michael Ball, D.O., for arthritis pain (Tr. at 921). She said her back pain was an 8/10 but she took Aleve and it helped. Her exam was normal.

On March 20, 2010, plaintiff was seen at Mountain Grove Medical Complex for an unrelated issue, and she said she needed a refill of Flexeril, a muscle relaxer (Tr. at 905-907).

On May 28, 2010, plaintiff saw Dr. Ball for back pain (Tr. at 922). She said her pain was an 8/10 and she had been taking Tramadol for years which was not helping. On exam, Dr. Ball checked "abnormal" as to plaintiff's abdomen, back and extremities. No further elaboration was provided. He assessed hypertension, hypothyroidism and obesity.

On June 14, 2010, plaintiff was seen by Mandy Browning, a social worker, at Mt. Grove Clinic for a clinical assessment (Tr. at 880-887). Plaintiff arrived alone and was described as cooperative. Plaintiff referred to when she "had that last stroke." Plaintiff said she was with a good man now and she did not want to lose him. "I'm drawing disability on my mental state, and I'm 100% disabled on my mental and physical state. Horrible crying spells, I couldn't stop if I wanted to. . . . I got up to 300 pounds, and now I'm down to about 270, I've been doing a lot of walking. . . . The first stroke was November 12, 2008. The last one was October 12 or 14 of 2009." Plaintiff said she could hear people talking about her outside her

41

trailer. "I've had that on and off my whole life, but I can control it when I 'm on the right medication." Plaintiff said she was administered shock therapy in 1980 when she lived in New York. Plaintiff said she had been hospitalized for psychiatric problems "at least every two years since the age of 17." Plaintiff said she currently had fibromyalgia and "breast, ovarian and possibly colon cancer". She reported occasionally using alcohol. "My dad was an alcoholic; I never want to be that way, and I can go years without drinking."

> Caralee reports frequently using cannabis "just hits, passing a joint, passing a bowl. I don't crave it, but the last five years the pain has gotten so bad, it seems to help. . . . Caralee reports previously using methamphetamine, last used in 2007. She first started using it when her husband put it in her and her son's coffee in the late 1990s, "and every now and then I'll take a ball or something, but I haven't taken any since April 25th and I don't plan on taking any." Caralee reports occasionally misusing prescription medications: "sometimes I'll buy it off the black market if I'm feeling really bad." Caralee reports previously using other drugs, crack "back when I was a needle junkie 1977-1980". . . . Caralee reports that the drugs most commonly preferred were marijuana and the amount and frequency of use was "I look forward to it and see the people coming, but I've never bought it myself."

Plaintiff had been smoking since age 12 and was smoking a little under two packs of cigarettes per day. Plaintiff said she drinks at least a pot of coffee each morning and she gambled compulsively "on and off when I had those down years."

> Caralee reports "my husband I'm still married to, he won't divorce me. . . . He's got my son John now, he's 14. He's down in Arkansas living with friends. I visited him and he's doing good, but he doesn't get any of his check, he gets $418 and his brothers take it. . . . [T]hey declared me too defective to take care of a 15 year old son, but now I can walk again and I just have to get a court date and I'll get him back again". . . . She reports physical abuse by her mother when she was growing up as well.

Plaintiff said she had 7 siblings -- 4 sisters and 3 half brothers. Plaintiff said her mother hit her father and set him on fire.

Plaintiff was currently living with her significant other. "Caralee graduated college; she has a Master's degree in Early Childhood Education and taught for 20 years. Caralee reports learning disabilities, dyslexia." She reported going to church three nights a week.

Plaintiff said she wrote hundreds of thousands of dollars' worth of bad checks and spent a little over a year in prison. She said she had "a lot of really good friends who love me."

Plaintiff was described as calm and cooperative with appropriate behavior yet distractible thought process. Her judgment and insight were moderately impaired. Immediate memory was noted to be impaired. She was 75% on task as far as attention and concentration. She was assessed with major depressive disorder, recurrent, severe with psychotic features; post traumatic stress disorder; panic disorder without agoraphobia; cannabis abuse; polysubstance dependence; and rule out bipolar disorder. Her current GAF was 38-40.

On July 13, 2010, plaintiff saw Richard Alken, M.D., at Mt. Grove Clinic (Tr. at 888-889). Plaintiff reported difficulty sleeping, and she said she would all of a sudden start crying for no reason. Plaintiff said that she had been having panic attacks. "Her mood has been affected since she had a stroke on November 13, 2008." I note that on November 13, 2008, plaintiff was admitted to the Arkansas State Hospital after she was evaluated in jail 2 days earlier. Plaintiff did not have a stroke. Plaintiff told Dr. Alken that she had been taking Depakote for seizures that she had been experiencing since her stroke. Plaintiff said she occasionally hears people talking outside her trailer but there is no one there. She was assessed with major depressive disorder with a GAF of 32. "I shall re-start this patient's medication." He did not list the medications he prescribed, so it is unclear whether plaintiff was given a prescription for Depakote; however, she had never been prescribed this medication in the past.

On December 16, 2010, plaintiff was seen at Cox Health South emergency department after having fallen at home (Tr. at 935-948). She did not lose consciousness, but she arrived in an ambulance. She described her pain as a 10/10. She reported a past medical history including seizures, hypertension and emphysema. She said her normal gait is to shuffle due to having had a stroke, and she fell while walking. "The patient has not experienced similar

symptoms in the past." "Patient talking on cell phone. The patient is laughing, no evidence of discomfort, the patient smiles." X-rays of her lumbar spine and pelvis were normal. Plaintiff was given morphine for her pain. She was discharged with prescriptions for Flexeril (muscle relaxer) and Ultram (for pain).

On December 26, 2010, plaintiff was seen at Cox Health Urgent Care complaining of back pain after having fallen down the stairs (Tr. at 925-932). Plaintiff was crying and anxious. She reported her past medical conditions to include depression, seizures, hypertension, stroke, and emphysema. She continued to smoke. "Pt. had a stroke 3 years ago since then has been quite emotional all the time, has shuffling gait and frequent falls. The patient has experienced similar episodes in the past, multiple times." Plaintiff had not taken her thyroid medication for several months due to lack of funds. X-rays of her lumbar spine and pelvis were normal. She was prescribed Flexeril, a muscle relaxer.

On January 5, 2011, plaintiff was seen by Jennifer Whitaker, Advanced Practice Registered Nurse, at the Mt. Grove Clinic (Tr. at 890-891). Plaintiff arrived alone. She reported that some nights she sleeps for 12 hours, other nights not as well. Plaintiff had been out of her Trazodone for 3 months. Plaintiff said her mood was "awesome" on Pristiq, but she had not taken that medication "for awhile." Plaintiff said she had seizure disorder. "Tells me she has recently been out and getting her hair done and she enjoys this." Plaintiff was alert and oriented times three. Grooming, dress, and hygiene were good. Her affect was pleasant, "but she also has some bizarre mannerisms." Ms. Whitaker restarted all of plaintiff's medications. This medical record is the first one showing that plaintiff was prescribed Depakote.

On January 6, 2011, plaintiff was seen at Mountain Grove Medical Complex for knee pain and a rash (Tr. at 897-900). She continued to smoke a pack of cigarettes per day.

Plaintiff said she twisted her knee when she stepped off her porch. She said she had taken Zanaflex (muscle relaxer) and cyclobenzaprine in the past which worked well. She said she has a history of headache and seizures and is not able to take Depakote because it causes involuntarily movements. However, plaintiff had been prescribed Depakote the day before, possibly for the first time as it does not appear in any prior medical records, and she would again be prescribed Depakote in the future. Plaintiff weighed 271 pounds. Under plan, the doctor noted that plaintiff would need an x-ray when she her insurance became effective, and that they would "begin process of evaluating knee pain and back pain."

On January 19, 2011, plaintiff saw Jennifer Whitaker, APRN, at the Mt. Grove Clinic (Tr. at 892-893). Plaintiff came in alone. "For some reason her Medicaid card is inactive and she does not know why and she is not able to get her medications." Plaintiff said she had no money and could not fill her last prescription. Plaintiff was told she could fill her prescription at the Family Pharmacy until her Medicaid comes through. She was alert and oriented times three. Grooming, dress, and hygiene were "just fair." Eye contact was good. Her mood was down. She said her son had gone to live with her ex-husband and was only calling her once every other week.

On January 21, 2011, plaintiff was seen at Mountain Grove Medical Complex to pick up her medication (Tr. at 901-904). She had not had lab work done as directed. She weighed 273.8 pounds. Her medications were refilled and she was told to have her lipids checked before her next appointment.

On February 9, 2011, plaintiff was seen at Ozarks Medical Center complaining of diarrhea (Tr. at 874-875). Her back and extremities were normal; she was alert and oriented times three with normal mood and affect.

On February 10, 2011, plaintiff had a pelvic ultrasound for an unrelated condition (Tr. at 876).

On March 1, 2011, plaintiff was seen at Ozarks Medical Center (Tr. at 873). She had an x-ray of her chest which was normal. She was assessed with shortness of breath.

On March 19, 2011, plaintiff was seen at Ozarks Medical Center for rib pain and a cough (Tr. at 868-872). She was smoking a pack of cigarettes per day. Plaintiff said she had been treated for pneumonia three weeks earlier; however, there are no records diagnosing her with pneumonia. Chest x-rays were normal; chest CT scan was essentially normal. Plaintiff was prescribed an Albuterol inhaler and told to follow up with her primary care physician.

On June 1, 2011, plaintiff saw Shelley Sutton, D.O., at Mt. Grove Clinic (Tr. at 894-896). Plaintiff said she had been off her medications from December 2010 through April 2011 due to "medication coverage issues." Plaintiff had restarted her medications two weeks earlier. "She has a recent stressor of breaking up with fiancé. . . . She has had multiple psychiatric hospitalizations. First hospitalization was in 1999 due to 'nervous breakdown.' Last hospitalization was in 2008 at the State Hospital in Arkansas for 2 months. She had been aggressive towards husband. . . . She used to drink a 6 pack and a pint [of] whiskey per day. She has had withdrawal and tolerance with alcohol. She quit drinking alcohol about 3 weeks ago." Plaintiff reported that her sister was currently in a long-term psychiatric facility for bipolar disorder and that her mother had that illness as well. Plaintiff was described as disheveled with fair grooming. She was cooperative and mildly restless. Plaintiff denied auditory or visual hallucinations. Memory and concentration were fair. Plaintiff was diagnosed with bipolar disorder mixed severe with psychotic features, post traumatic stress disorder, and alcohol dependence with a GAF of 40. She was started on Seroquel XR and continued on Depakote and Pristiq.

On June 6, 2011, plaintiff was seen at Mountain Grove Medical Complex due to vaginal bleeding (Tr. at 913-915). "Discussed possible need for endometrial biopsy depending on the test results."

On September 9, 2011, plaintiff had a pelvic ultrasound for an unrelated condition (Tr. at 867).

On October 6, 2011, plaintiff was seen at Mountain Grove Medical Complex (Tr. at 917-919). She had been out of her Flexeril and Naproxen (muscle relaxer and non-steroidal anti-inflammatory). She had not been taking Pristiq (antidepressant), she was out of Vistaril (treats anxiety), she was out of Depakote but denied seizures, and she was out of her thyroid medication. She was told to resume all of her medications as previously prescribed.

On December 30, 2011, plaintiff saw Mazhar Rahman, M.D., at Ozarks Medical Center (Tr. at 852-866). She arrived by ambulance and complained of chest pain that had started 3 hours earlier but was better upon arrival. Her chest pain had been a 10/10 but after receiving nitroglycerin from the paramedics it was reduced to a 1/10. Plaintiff reported her weight as 280 pounds. She was alert and oriented, anxious, in mild distress. Her cardiac exam was normal, she had normal range of motion in her extremities, her EKG was normal, chest x-ray was normal. She had a nuclear stress test. "As per the patient, last night she was going to her boyfriend's place, and while she was climbing the stairs, all of a sudden, she felt extremely short of breath, not able to breathe and then she started having chest pain. . . She does have a history of emphysema and she uses inhaler and as per the patient, she has been off her inhaler for two days. . . . [S]he did mention she has diarrhea going on for two weeks now. As per the patient, it was a viral illness and her boyfriend and most of the people there have been having diarrhea." Plaintiff said she lost her inhaler. Plaintiff said she stopped smoking three months ago; she denied drinking and drug abuse history. Plaintiff denied seizure activity, she said she

had only common arthralgias in her musculoskeletal system, and her mood was noted to be stable. She was assessed with chest pain caused by COPD exacerbation. She was discharged on her normal medication: Advair (inhaler), Synthroid (for hypothyroidism), Lisinopril (for hypertension), Toprol XL (for hypertension), Pristiq (treats depression), and Albuterol (inhaler). She was given new prescriptions for Plavix (blood thinner) because she is allergic to aspirin, and nitroglycerin until she was able to see a doctor on an outpatient basis.

On January 9, 2012, plaintiff saw Dr. Ball and said she wanted a refill of Valium (Tr. at 923). No record to date shows that plaintiff was ever prescribed Valium. Plaintiff was assessed with anxiety on this day and was prescribed Valium, 10 pills.

On February 7, 2012, plaintiff saw Connie Armstrong, a nurse practitioner, at Ozarks Medical Center (Tr. at 849-851). She complained of nausea and shortness of breath about 9 hours earlier, but it had resolved by the time she arrived. Plaintiff denied headaches, and she denied joint pain. Plaintiff continued to smoke, but she reported no alcohol or drug use. Plaintiff was noted to be alert and oriented times three and in no acute distress, but she was anxious. Her blood pressure was normal. On exam her back was normal. Extremities had normal range of motion. She was assessed with "moderate nausea, probable anxiety reaction." She was told to rest, with no strenuous activity, "avoid tobacco smoke. Do not smoke. Lose weight. No alcohol." She was given a two-day prescription for nausea medication.

On May 11, 2012, plaintiff was seen by Michael Walsh, M.S., a licensed psychologist, in connection with her disability case (Tr. at 818-827). Plaintiff provided a driver's license for identification. Plaintiff's hygiene was good and she was dressed appropriately. She was described as positive and cordial. No abnormal gait, posture or motor movements were observed. Mr. Walsh had no records to review; he relied on plaintiff as the sole source of information. Plaintiff stated that she was disabled because of arthritis in her legs and back,

right leg injury, blood pressure, severe memory loss, heart problems, post traumatic stress disorder, and chronic migraine headaches. She also alleged disability due to bipolar disorder "which was not indicated on the allegations form provided by SSDD."

Plaintiff said that Metoprolol has controlled her heart condition and her hypertension. Plaintiff said she was an abused wife from 1992 until 2001 when she was hospitalized for 10 days in Arkansas and was discharged to a battered woman's facility. Plaintiff reported continuing to have flashbacks to the abuse which give her panic-like symptoms. Plaintiff said she was diagnosed with bipolar disorder in 2007 when she sought treatment in Mountain Home, Arkansas, following her inpatient treatment at the Arkansas State Hospital.

> She reported that at the time of her diagnosis, she was having mood swings, described as "being happy and high one moment, unhappy and crying the next." Asked to identify her current symptoms related to her bipolar disorder, the claimant reported, "These mood swings are the only things I can think of."

Plaintiff said that her severe memory loss began when she working for a pizza place in 2006. "When I worked at Town and Country Donuts, I tried to work, but had memory problems there also. I'd forget that I had put bread in the oven. Things like that."

Plaintiff denied any form of abuse during her childhood or adolescence. She said she has an older sister, age 63, and a younger sister, age 48. Plaintiff was 52 at the time. She was living with her boy friend and her 16-year-old son at the time of this evaluation. She reported frequent attendance at a Baptist church. Her hobbies included watching television and gardening.

> Plaintiff has a GED and she completed two college courses in child development.

> She stated that her last employment was as a cold food prep delivery driver for Nima's Pizza in Mountain Home, Arkansas, where she worked from 2006 until she had a stroke in 2008. . . . She reported that she has never been terminated or forced to resign under duress from any of her jobs.

Plaintiff said she had last seen Michael Moore, M.D., her primary care doctor, two months ago for treatment of symptoms related to panic attacks. She reported that he put her on Valium which was working well. There are no records from a Dr. Moore from two months earlier, and the records show that plaintiff was prescribed 10 Valium pills by Dr. Ball in January, but none before and none after that.

Plaintiff reported taking medication for thyroid and hypertension as well as Pristiq (treats depression) and Depakote (mood stabilizer). She was on no pain medication.

This individual reported having experienced two seizures in her 40s, which she indicated she was told "were caused by stress." She indicated one job-related injury: In 1989 while working as an inserter at the Harold Tribune newspaper, "the machine broke; and some paper fell onto my lower back and messed up two discs. I don't have any cartilage in them now. That's what makes it hard to move." Medical history is negative for serious head injuries or loss of consciousness.

The claimant reported no history of psychiatric problems prior to 1994, at which time she reported that she became acutely suicidal following the stillbirth of her daughter. She claims at that time, she obtained a gun with the intent of shooting herself. However, she did not complete the act; and she reported no follow-up mental health treatment as a result of that episode.

In 2001, the claimant stated that she was placed into the Phelps County Medical Center's psychiatric ward for 10 days for treatment of posttraumatic stress disorder secondary to domestic physical and emotional abuse directed against her by her second husband. Upon discharge from this admission, she reported that she was referred to a battered woman's shelter for assistance. The claimant reported that she did not engage in outpatient mental health services for continued treatment of this problem following her release from the Phelps County facility. The clamant reported that her second psychiatric hospitalization occurred in 2007 at which time she claims to have been admitted into the Arkansas State Hospital for 45 days of treatment, following discharge from a two-day stay for treatment at the Baxter County Regional Medical Center following a "stroke." I am unclear as to the nature of her report here, as medical records are unavailable for review and her account of the nature of th is medical episode makes little clinical sense. If her alleged "stroke" represented a significant vascular event with debilitating sequelae warranting post-rehabilitation treatment, it is unlikely that her acute stay at the regional medical facility would be of such short duration. Further, the Arkansas State Hospital does not provide rehabilitation treatment for post-stroke injury. The claimant does not evidence any noticeable residual physiological or linguistic effects consistent with a post-stroke presentation; so I do not know quite what to make of this report.

Plaintiff reported receiving no outpatient mental health services prior to 2007 following her discharge from the Arkansas State Hospital. She was treated in Arkansas from 2007 through 2009 when she moved to Missouri and began treatment at Ozarks Medical Center.

Despite claiming serious memory problems, plaintiff was able to report that she had been arrested three or four times for domestic dispute issues, once for possession of marijuana, twice for public intoxication, once for DWI, and once for a "hot check charge."

> The claimant reported that she has not consumed any alcohol since April 6th of this year, although she is "trying to quit using it altogether." She reported that her alcohol beverage of choice is whiskey; and she noted that at her heaviest usage of this substance, she has been known to consume a fifth of it at one sitting. Although the claimant reported a number of alcohol-related criminal convictions, she denied having a problem handling her alcohol use. This individual reported that she has not used illicit substances recreationally since 2005 at which time she reported smoking a joint of marijuana socially in Arkansas. The claimant reported no history of formal treatment for alcohol or drug-related activity.

> The claimant's ability to engage in age-appropriate ADLs does not appear to be significantly impaired at the present time, as evidenced by her ability to meet her basic needs, to engage in housekeeping chores, and to engage in leisure activities including gardening and other related outdoor activity.

Mr. Walsh administered myriad tests to measure plaintiff's mental abilities. He observed that she was alert and oriented to person, place, time, and situation. Attention, concentration, and working memory were good generally based on her test results. Her cognitive function was normal, quality of thinking was good, mental control was intact, intelligence was average. Her eye contact was direct and appropriate. Plaintiff reported that her mood was tired and depressed. She said her family and friends argue and then try to drag her into it, but she does not want to take sides. Mr. Walsh observed that plaintiff exhibited "appropriate periods of smiling and laughter" during the examination. Plaintiff reported that she sleeps for about 10 hours each night undisturbed. "No physiological, cognitive, or behavioral indicators of anxiety were noted during the evaluation." She had no suicidal

ideation, she spoke in a spontaneous manner, her speech was normal, thought processes were

logical, coherent and goal directed. "The claimant denied auditory and visual hallucinations;

and there was no objective evidence to suggest any problem with a perceptual disturbance."

> The claimant made no spontaneous reports regarding issues related to her degenerative arthritis or to her migraine headaches when asked to identify her reasons for seeking disability, suggesting that these problems likely are either well controlled with her current medication regimen or that they are not of consequential intensity to warrant focused attention at the present time. . . . Although she reported a history of bipolar disorder, she was unable to describe symptoms of her experience of this disorder apart from generalized "mood swings." The claimant reported a history of "severe" memory loss dating back to 2006, although no evidence of such memory loss was observed during today's evaluation.

> Mr. Walsh assessed post traumatic stress disorder, chronic; bipolar II disorder, most

recent episode depressed, in partial remission; alcohol dependence without physiological

dependence, early full remission; and cannabis abuse by history. With regard to post

traumatic stress disorder and "[b]ased on the claimant's presentation and on her report of the

experience, however, I believe that this condition is currently of mild severity, perhaps given

her current medication regimen in combination with outpatient therapy; and I do not believe

that it would preclude her ability to engage successfully in gainful employment at this time."

> The claimant reported mood swings consistent with what is often seen in persons with bipolar disorder. I was unable to elicit from her a history of sufficient intensity of clinical symptoms that would lead me to believe that she had ever experienced a true manic episode. Given her description of her symptoms together with her psychosocial history, intensity of at least one hypomanic episode is more likely. Certainly symptoms consistent with the depressive spectrum of this disorder are present, although they do not appear at the moment to meet the requisite number in order to establish a full major depressive episode. Thus, a diagnosis of Bipolar II Disorder, Most Recent Episode Depressed, in Partial Remission seems appropriate. This claimant's current medication regimen seems to be effective in ameliorating many of the symptoms associated with this disorder.

He assessed a GAF of 63 and found that plaintiff's ability to perform work-related functions

"does not appear to be significantly impaired at the present time." He found that plaintiff is

able to understand and remember complex instructions; sustain concentration and persistence

with complex tasks; and interact in high contact situations involving work supervisors, coworkers, and the general public and adapt to a complex environment (Tr. at 827-830).

On August 28, 2012, plaintiff was evaluated by Philip Brown, Ph.D., in connection with her disability case (Tr. at 834-842). Plaintiff reported feeling depressed every now and then. She starts crying for no reason and cannot stop. This happens several times a week, but in between crying spells she feels relatively good. "I can't concentrate anymore. I can't remember nothing. It's like in one ear and out of the other." Plaintiff reported becoming easily overwhelmed with household chores such as doing laundry or dishes. "Forgetting really bothers her and leaves her wondering, at times, whether it is worth going on with life." Plaintiff has thoughts of suicide "but 'not real often. It's been awhile.' When asked if she has any intentions of following through on those thoughts, she said, 'No, because I can't figure out how. I don't think I could ever really hurt myself physically." Nonetheless, she said that in April 2011 she 'drank a massive amount of alcohol, whiskey, in an attempt to 'kill myself.' She said the reason she wanted to kill herself in April 2011 was that she was 'just tired of being alone. Not being able to function like I used to.'"

Plaintiff said it takes her forever to get to sleep, and she has had sleep problems for the last two years. She sleeps for about five hours a night.

Ms. Akkerhuis said there have been times since "2007" when she has heard things. "It's like the radio, like you can't dial it in. And then I'll go, and the radio isn't even on." She said that in 2010 her son asked to go live with his father, because he grew scared of her after she started talking about hearing things and asking him if he heard what she was hearing.

Plaintiff said she wanted to kill herself in April 2011 because she was tired of being alone. Yet she said later that whenever she is around anyone besides her son, she feels anxious and panicky, with rapid breathing and difficulty catching her breath. Plaintiff said her husband tried to kill her three times. Twice he tried to strangle her while she was sleeping,

and once he jumped her outside her house with a knife in his hand and attempted to stab her. She screamed and he froze and then ran away. She has flashbacks "once in a great while." Even when she does have flashbacks, they are not as bad as they used to be. She said she stopped driving because driving a car would spark a flashback because the smell of a car reminded her of her husband, who was a mechanic. She said she is ok riding in a car if someone she knows and trusts is driving.

Plaintiff reported a psychiatric hospitalization in 2001 or 2002 after she had a nervous breakdown. She was in a battered woman's shelter and could not stop crying. She was discharged after two weeks. Her second psychiatric hospitalization occurred on November 2, 2007, when she began a more-than-30-day stay at the Arkansas State Hospital due to a second nervous breakdown. Plaintiff received outpatient services until March 2011 when her insurance changed to Medicare which required that she pay a co-payment -- "she did not have the money to pay for any part of the cost of her services." Plaintiff reported having several head injuries through the years and "several have resulted in her being rendered unconscious."

Plaintiff reported that Valium was helping to control her anxiety, but then added, "'staying away from people' has helped 'relieve a lot of that stress, that awful panic feeling.'" Plaintiff reported that she gets along with her 17-year-old son "pretty good." She had not seen either stepson since 2008. One of them "robbed her of everything she had" and she was never close to the other. Plaintiff has one friend to whom she talks on the phone four or five times a week. In her spare time, she watches television, sits outside when the weather is nice, and sometimes walks to the store. She goes early in the morning when not many people are around.

Plaintiff reported occasional use of alcohol. "She said there was never a time in her life when she consumed alcohol daily, but she said that for a period of time after completing high school she engaged in binge drinking. She said she has never used street drugs".

Dr. Brown noted that plaintiff smiled at times, her thoughts were organized, she was alert and oriented in all spheres. "There were several times during this evaluation that she seemed to had [sic] considerable difficulty remembering parts of her past; she said she has had problems with her long- and short-term memory functions since '2007'." Plaintiff's speech was clear and easily understood, her hygiene was good, and her gait was steady and unimpaired.

Dr. Brown assessed panic disorder with agoraphobia; major depressive disorder, recurrent, severe with psychotic features; and post traumatic stress disorder. He assessed a GAF of 52.

Despite the severity of her psychiatric symptoms and the strong negative impact they have on her ability to work and interact with others, she has not been actively involved in psychiatric treatment since March 2011. She cited her primary reason for dropping out of psychiatric treatment as being unable to afford the co-payment her insurance (Medicare) required her to pay for such services. Additionally, though, she voiced dissatisfaction with the services she found saying they did not provide her the progress toward treatment objective achievement she desired and needed. She does, however, continue taking two psychotropic medications she had been prescribed prior to discontinuing her psychiatric services, and it is her primary care physician who has been prescribing those medications.

Ms. Akkerhuis has been taking an anti-depressant that possibly attenuated her symptoms of depression to some extent. However, given the frequency of the unprovoked crying spells she has been experiencing, it appears likely her anti-depressant is losing its effectiveness and is, at best, inadequate as a stand-alone treatment for her depression. She is prescribed and takes an anti-anxiety medication, but it alone is not and will likely never yield remission of her anxiety symptoms. Her anxiety is comprised of numerous symptoms including panic attacks, which she is prone to experience when she has to interact with groups of people, intense fear, strong feelings of vulnerability, and flashbacks of traumatic events that tend to occur when she attempts to drive herself to appointments or engagements. Consequently, she has avoided social contact as much as she possibly can for the past four years, and she drives herself nowhere.

The severity, chronicity, and number of symptoms experienced by Ms. Akkerhuis all combine to greatly impair her social functioning. With her unable to interact with others in meaningful, goal-directed ways, it is very unlikely she would be able to secure and maintain gainful employment -- the problems she faces are numerous. Specifically, it was apparently to this clinician that she had significant impairment in her abilities to remember and recall information, and those impairments would make it very difficult for her to remember work-like procedures, make anything more than the simplest work-related decisions, and sustain an ordinary routine without special supervision. The hypervigilance she experiences when she is among a number of people would almost certainly result in her being unable to establish and sustain the focus needed for her to perform even simple work-related tasks and see those tasks through to completion. Her agoraphobic fears are so pronounced that attempting to drive herself anywhere is something she no longer undertakes. As well, those same fears escalate to panic when she is in crowded situations and would, thus, preclude her from utilizing public transportation to and from a job. Her depressed state and symptoms of anxiety compromise her coping abilities. Her limited threshold for stress-laden situations would make it very difficult to impossible for her to accept instructions and respond appropriately to any perceived criticism from supervisors and for her to respond appropriately to changes in even a routine work setting.

Indeed, Ms. Akkerhuis is in need of mental health treatment. Without ongoing psychiatric and psychological services, it is very unlikely she will ever be a candidate for employment. Even with such services in place, getting her symptoms attenuated and restoring her ability to function adequately among others would be a costly and time-consuming process. At the very least, she is in need of being re-evaluated by a psychiatrist and started on a medication regimen that could at least lift her mood and calm her anxieties. Medication alone would not be enough, though, to restore her ability to function socially and occupationally. For such to occur, she would have to be involved in ongoing, regularly scheduled psychotherapy and not supportive therapy/counseling. Through psychotherapy she could engage in treatments that would help her learn the cognitive change skills and behavior modifications that could result in her attenuating and, perhaps, eliminating her panic symptoms. Additionally, in psychotherapy she could be exposed to cognitive-behavioral procedures that would help improve her sense of self-esteem and her self-confidence. Again, no one form of treatment in isolation will ever yield the symptom remission and functional improvements needed for Ms. Akkerhuis to be able to re-enter the workforce in any meaningful way, and even with proper treatments, her prognosis is, at best, fair.

On September 3, 2012, Dr. Brown completed a Mental Residual Functional Capacity Questionnaire (Tr. at 842-847). He found that plaintiff had no mental ability that he would rate "unlimited or very good." He found that plaintiff's abilities are limited but satisfactory in the following areas:

- Understand and remember very short and simple instructions

- Carry out very short and simple instructions

- Ask simple questions or request assistance

- Be aware of normal hazards and take appropriate precautions

- Adhere to basic standards of neatness and cleanliness

- Travel in unfamiliar place

He found that plaintiff's abilities were seriously limited but not precluded in the following areas:

- Remember work-like procedures

- Maintain attention for two hour segment

- Maintain regular attendance and be punctual within customary, usually strict tolerances

- Sustain an ordinary routine without special supervision

- Make simple work-related decisions

- Perform at a consistent pace without an unreasonable number and length of rest periods

- Accept instructions and respond appropriately to criticism from supervisors

- Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes

- Respond appropriately to changes in a routine work setting

- Set realistic goals or make plans independently of others

- Interact appropriately with the general public

- Maintain socially appropriate behavior

- Use public transportation

He found that plaintiff was unable to meet competitive standards in the following areas:

- Work in coordination with or proximity to others without being unduly distracted

- Complete a normal workday and workweek without interruptions from psychologically based symptoms

- Deal with normal work stress

- Understand and remember detailed instructions

- Carry out detailed instructions

- Deal with stress of semiskilled and skilled work

He found that plaintiff does not have reduced intellectual functioning and that plaintiff's psychiatric condition does not exacerbate plaintiff's experience of pain or any other physical symptom. He predicted that plaintiff would likely miss more than four days of work per month due to her impairments or treatment. Plaintiff is able to manage her own funds, and alcohol or drug use did not play a part in Dr. Brown's findings.

Curiously, Dr. Brown also completed a second check-the-box form regarding plaintiff's abilities that was a part of this form; however, his findings were not entirely consistent (Tr. at 845-847). For example, despite finding that plaintiff's ability to understand, remember and carry out very short and simple instructions was "limited but satisfactory" on page 2 of the form (Tr. at 846), he found "no observable limits" in plaintiff's ability to understand, remember and carry out very short, simple instructions on page 5 of the form (Tr. at 846). He found no observable limits in plaintiff's ability to ask simple questions or request assistance on page 5, but found that plaintiff's ability to ask simple questions or request assistance was limited but satisfactory on page 2. He found that plaintiff's ability to travel in unfamiliar locations was limited but satisfactory on page 2, but he marked the greatest restriction possible for this ability on page 5. He found that plaintiff's ability to set realistic goals or make plans independently of others was seriously limited but not precluded on page 2, but he again marked the greatest restriction possible for this ability on page 5.

## V.    FINDINGS OF THE ALJ

Administrative Law Judge David Fromme entered his opinion on February 11, 2013 (Tr. at 608-621).  Plaintiff's last insured date is March 31, 2013 (Tr. at 608, 610).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 611).

Step two.  Plaintiff has the following severe impairments:  lumbosacral degenerative disc disease; right knee degenerative joint disease; osteoarthritis of the lumbar spine, right knee, and ankle -- all exacerbated by obesity -- as well as major depressive disorder, intermittent explosive disorder, post-traumatic stress disorder, and polysubstance abuse (Tr. at 611).  Plaintiff did not seek medical treatment for migraine headaches and therefore that alleged impairment is not medically determinable (Tr. at 611).  Plaintiff's hypothyroidism, endocrine disorder, hypertension and slight perfusion defects of the heart are non-severe impairments (Tr. at 611-612).  Plaintiff's chronic obstructive pulmonary disease is non-severe as plaintiff continued to smoke, chest x-rays were normal, her lungs were clear on examination, and she has not required any aggressive treatment for this impairment (Tr. at 612).  Plaintiff's alleged history of cerebrovascular accident and multiple traumatic brain injuries with loss of consciousness are non-severe as they have not required aggressive treatment and the evidence of their existence is plaintiff's allegations to emergency room personnel and others that she has this history (Tr. at 612).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 612-615).

Step four.  Plaintiff has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for 2 hours per day, and sit for 6 hours per day.  She can perform simple, routine, low-stress work not requiring the following: fast-

paced activity, strict and explicit quotas, deadlines, schedules, frequent or unusual changes in the work setting, interaction with the public, close personal interaction with coworkers, more than occasional interaction with supervisors, a high level of concentration such as work requiring sustained attention to detail (Tr. at 616). With this residual functional capacity, plaintiff is unable to perform her past relevant work as a sandwich maker, assistant restaurant manager, retail cashier, cashier II, delicatessen cutter/slicer, or pizza cook (Tr. at 620).

Step five. Plaintiff is capable of working as an assembler of plastic hospital products or a bench assembler, both of which are available in significant numbers (Tr. at 621). Therefore, plaintiff is not disabled (Tr. at 621).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining

credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the <u>Polaski</u> opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are based on the lack of clinical and objective findings to substantiate plaintiff's complaints of physical limitations, self-reported activities of daily living which are inconsistent with disability, inconsistencies in her allegations regarding suicide attempts, a failure to avail herself of treatment for her allegedly disabling mental disorders while seeking medical treatment for physical conditions, evidence that plaintiff used her Medicaid benefits for other conditions while claiming she did not know she had the coverage for her allegedly disabling impairments, and evidence that she stopped working for reasons other than her impairments.

The record in this case supports the ALJ's determination that plaintiff's subjective complaints are not credible. However, disturbingly, I note that plaintiff's inconsistent allegations span many years, are sometimes bizarre in nature, and are sometimes provided not to further her own interests -- the things she says to medical professionals are not always designed to secure disability benefits or even to secure prescriptions for drugs she might find

desirable.  There are personality disorders characterized by, among other things, a long history of "frequent and repeated lying for which no apparent psychological motive or external benefit can be discerned," i.e., not told to obtain external benefit or to avoid punishment, but are rather apparently purposeless. In some cases, the inconsistencies might be self-incriminating or damaging, which makes the behavior even more incomprehensible.[7]

This record is replete with instances of far-fetched, easily disproved, and sometimes bizarre contradictions on plaintiff's part.  Some examples:

◆ In a Function Report plaintiff said she cannot drive because her leg hurts too much to use the gas pedal.  She told Dr. Efird in October 2007 in connection with her disability claim that she let her license expire because of a car accident in April 2007.  In 2012 in connection with her disability claim she said she stopped driving because the smell of a car triggered flashbacks of her abusive husband, even though she does not have trouble riding in a car.

◆ Plaintiff testified that she weighed 190 pounds in 1993.  There are no medical records from 1993; however, in January 1996 she weighed 270 pounds.  She testified in November 2012 that since she stopped working in April 2007 her weight has "gotten out of control."  However, her medical records show that from 1996 through 2012, her weight remained stable, although she was obese that entire time.

◆ Plaintiff testified that she was in a bad car accident in April 2007.  There are medical records dating back to 1996; however, there are no medical records substantiating plaintiff's testimony that she was ever in a car accident.  She did not mention it during a hospital visit four months later, and she did not mention it to Dr. Efird in October 2007 when he examined her in connection with her disability claim. In November 2008 when plaintiff was hospitalized, she was asked if she had ever been in a severe accident. She did not report any accident from April 2007, but she did say she had been hit by a cement truck when she was a teenager, an allegation that appears nowhere else in this record.

◆ Plaintiff testified that she suffered falls at work in June 2006 and February 2007.  The medical records support her allegation of a fall in June 2006; however, there are no medical records substantiating her claim of a fall in February 2007.

◆ Plaintiff testified during the first hearing that she was hit in the head and knocked unconscious five or six times by her husband.  During the second hearing, she testified

[7]http://www.psychiatrictimes.com/articles/pathological-lying-symptom-or-disease#sthash.3 vjJe27K.dpuf

that her husband would beat her until she was unconscious three or four times a week, sometimes more often. Plaintiff's medical records from June 2, 2006, establish that when she fell at work, she did not lose consciousness. Plaintiff told Dr. Smith in January 2008 during a consultative examination that she had a history of multiple closed head injuries due to car accidents and assaults by her spouse, and at least one incident of being choked to unconsciousness. In May 2012 plaintiff denied any history of unconsciousness. In August 2012 she told Dr. Brown in connection with her disability case that she had experienced several head injuries through the years, several of which had rendered her unconscious.

◆ Plaintiff testified in November 2012 that she has a GED and no further education. She told a social worker in March 2002 that she was a few hours short of having an Associate's degree in business. Plaintiff told emergency room personnel in November 2008 that she had a Master's degree in early childhood education. She told a social worker in June 2010 that she had a Master's degree in early childhood education and taught for more than 20 years. Plaintiff told psychologist Michael Walsh that she had a GED and had completed two years of college courses in child development.

◆ On January 22, 1996, plaintiff denied seizures. The first time seizures were mentioned by plaintiff was during a consultative examination with Vann Smith, Ph.D., in January 2008 in connection with her disability application. Plaintiff told Dr. Alken in July 2010 that she was taking Depakote for seizures she had been having since her stroke. Plaintiff had never been prescribed Depakote up to that point and there is no medical support for her allegation of stroke. In December 2010, plaintiff went to the emergency room after allegedly falling. She reported a past medical history of seizures. Plaintiff reported a history of seizures when she was seen at the emergency room in December 2010. In January 2011 plaintiff told Nurse Jennifer Whitaker that she had a history of seizures. Ms. Whitaker wrote plaintiff a prescription for Depakote. The very next day, plaintiff was seen by another medical provider for a rash. She again reported a history of seizures and said she is not able to take Depakote because it causes involuntary movements, but that she had taken Flexeril and Cyclobenzaprine (Valium) in the past which had worked well. Despite her requesting these two medications, it is not clear that any prescriptions were written that day. In October 2011, plaintiff denied seizures although she said she had been out of her Depakote. In December 2011, plaintiff went to the emergency room after having fallen down the stairs, and she denied seizure activity. She was discharged on her normal medication which did not include any psychotropic medication or seizure medication. In May 2012 plaintiff told psychologist Michael Walsh, in connection with her disability claim, that she had had two seizures in her 40s which were caused by stress.

◆ On January 3, 2002, plaintiff denied ever having had suicidal ideation. In April 2002, she said she thought about suicide in 1994 when her baby died -- she took out a gun and contemplated committing suicide for about five hours. In April 2005, plaintiff denied suicidal ideation. On October 16, 2007, plaintiff denied suicidal ideation when being examined in connection with her disability claim. In November 2008 when she was hospitalized, plaintiff completed a suicide assessment in which she denied a history of suicide attempt or self harm. In May 2012 in connection with her disability case, she said she got a gun in 1994 with the intention of shooting herself. In August 2012, she

told Dr. Brown, in connection with her disability case, that forgetting causes her to wonder whether it is worth going on with life. She reported that in April 2011 she drank a large amount of whiskey in an attempt to kill herself.

◆ Plaintiff testified in November 2012 that she had to go to the emergency room several times after her alleged car accident to get pain medication. Plaintiff's medical records do not show emergency room visits for pain medication. Plaintiff told a nurse in April 2002 that she had been to the emergency room multiple times due to hives associated with anxiety and nervousness. The medical records do not support this allegation.

◆ Plaintiff testified in November 2012 that she has suffered with migraine headaches for ten years and that she gets a migraine headache once or twice a month, each lasting for 12 or 13 hours. In February 2012, plaintiff saw Connie Armstrong at Ozarks Medical Center and denied headaches. There is no complaint of migraine headaches in any medical record.

◆ Plaintiff testified in November 2012 that she has suffered with hallucinations since 2000. In November 2004, she denied hallucinations when being treated by Dr. Austin for her mental condition. In April 2005, plaintiff saw Dr. Austin for her mental condition and denied hallucinations. In May 2005, plaintiff denied hallucinations. The first mention of hallucinations in any medical record is in an October 2007 report of Dr. Efird who examined plaintiff in connection with her disability claim. She said these auditory hallucinations started about 4 or 5 months earlier, or in May or June 2007, and they occur about twice a week. In November 2008 while hospitalized, plaintiff denied hallucinations. In June 2010, plaintiff told a social worker she had experienced auditory hallucinations her entire life but they could be controlled with the right medication. In May 2012 plaintiff denied hallucinations to Mr. Walsh in connection with her disability case. In August 2012, in connection with her disability case, she told Dr. Brown that she has experienced auditory hallucinations since 2007.

◆ Plaintiff testified in March 2009 that she does not own a television set because she hears voices from them. Yet in November 2012 she described her day as including watching movies and the news on television every day.

◆ On June 2, 2006, plaintiff denied a history of stroke. On August 26, 2007, she denied a history of stroke. On June 14, 2010, plaintiff told a social worker that she had a history of stroke. She said her first stroke occurred on November 12, 2008; however, medical records show she was in jail on November 11 and was admitted to Arkansas State Hospital for psychiatric treatment on November 13, and nothing was ever said about a stroke. Plaintiff said her second stroke occurred on October 12 or 14, 2009; however, she did not provide any medical records for the entire year of 2009. Plaintiff told Dr. Alken in July 2010 that she had a stroke on November 13, 2008, again right after she was in jail. In December 2010, plaintiff went to the emergency room after having allegedly fallen. She reported that she had had a stroke sometime in the past which caused her to shuffle rather than walk normally. In December 2010 plaintiff reported having had a stroke three years earlier. In May 2012, she told psychologist Michael Walsh, in connection with her disability case, that she had had a stroke in 2008 which he did not appear to believe.

◆ Plaintiff alleged that she wound up in the hospital in November 2008 because she had recently learned one of her sons was using methamphetamine which caused her to become extremely stressed, landing her in the hospital. Elsewhere in the records of that hospitalization, she said she went to the hospital due to a nose bleed. When she was not allowed to call her son, she became abusive toward hospital staff and was taken to jail where she had a psychological screening.

◆ Plaintiff reported on March 4, 2002, to a social worker that she started smoking marijuana at age 13 and using alcohol at age 15. She said she used acid, cocaine, and mushrooms for 2 1/2 years in her teens. In April 2002, she told a nurse that in approximately 1993 she drank 1.75 liters of hard liquor every day and that until 5 or 6 years ago she used marijuana on a daily basis. She said she had used methamphetamine, LSD and speed in the past. In October 2005, plaintiff said she had been sober since November 7, 2003, and that before then she had been drinking a pint of alcohol per day. On August 30, 2006, she reported drinking alcohol occasionally. A year later, on August 26, 2007, she said she had not had any alcohol for the past 10 to 12 years. In October 2007, plaintiff told Dr. Efird in connection with her disability claim that she had not smoked marijuana in three years and that she has a beer about twice a year. Plaintiff told Dr. Smith in connection with her disability case in January 2008 that she was a non-drinker. In November 2008, she described having consumed whiskey the week before. In June 2010 plaintiff told a social worker that she frequently uses marijuana, "passing a joint, passing a bowl" which, I note, suggests more interaction with others than is currently alleged. She alleged last using methamphetamine in 2007. She said she misuses prescription medications, and she said she was a needle junkie from 1977 through 1980. In June 2011, plaintiff reported to Dr. Sutton that she previously drank a six pack and a pint of whiskey per day but that she stopped drinking alcohol 3 weeks earlier. In December 2011, plaintiff denied drinking and she denied history of drug abuse. In May 2012 plaintiff told Mr. Walsh that she had not consumed any alcohol since April 6, 2012, and that she had been known to consume a fifth of whiskey at one sitting. She said she last smoked marijuana in 2005. Plaintiff told Dr. Brown that there was never a time in her life when she drank alcohol daily, but she binge drank for a time after completing high school. She also told him that she "has never used street drugs."

◆ Regarding New Year's Eve 2001, plaintiff at one time said her husband pushed her down because she was physically assaulting others, and another time said her husband tried to choke her that night.

◆ Plaintiff told Dr. Austin in November 2004 that she was the youngest of four girls and always felt like the "add on," at the bottom of the love chain. In other medical records plaintiff said she was the third child with a sister several years younger. Plaintiff told a social worker in June 2010 that she is one of 8 children. She told psychologist Michael Walsh in May 2012, in connection with her disability case, that she had one older and one younger sibling.

In addition to the allegations that are easily disproved, there are many unusual stories[8] told by plaintiff as reflected in her medical records and appear to have no ulterior motive beyond simply relaying the story:

◆ In April 2002, plaintiff told a nurse that she saw her grandmother's watch in a pawn shop and went ballistic, requiring the police to be called. However, plaintiff said elsewhere that her parents were both from New York where she grew up before she moved away. It is unclear how she would have seen her grandmother's watch in a pawn shop in the Midwest. Regardless, there are no other records that mention this episode.

◆ In May 2005, plaintiff told Dr. Austin that she turned in child abusers who came back on her and she had the police called on her three times in one night and was put in jail for 4 to 5 hours; her ex husband bailed her out of jail from North Carolina.

◆ In October 2007, plaintiff told Dr. Efird, in connection with her disability claim, that she had been arrested on hot check charges, but that was due to a banking error. She told a social worker in June 2010 that she wrote hundreds of thousands of dollars' worth of bad checks and spent a little over a year in prison as a result.

◆ Plaintiff told Dr. Austin in November 2004 that she had been going through a divorce for 2 1/2 years and a typographical error resulted in the whole thing being "thrown out."

◆ In July 2006, plaintiff told a nurse that she had lost a very good friend the day before in a terrible motorcycle accident. That traumatic event was never mentioned again in any of plaintiff's medical or counseling records.

◆ In June 2010, plaintiff told a social worker she had been administered shock therapy in 1980. She said she had been hospitalized for psychiatric reasons at least every 2 years since she was 17. Yet the records reflect a total of 2 hospitalizations, one prior to plaintiff's alleged onset date.

◆ Plaintiff told a social worker in June 2010 that she had fibromyalgia, but she has never even alleged symptoms of fibromyalgia much less been diagnosed with that condition. She also reported having had breast, ovarian and possibly colon cancer; however, her medical records do not support these allegations.

◆ Plaintiff said she started using methamphetamine in the late 1990s after her husband put some in her coffee and her son's coffee. She used it until 2007.

---

[8]I do not mean to suggest that all of these allegations are false. However, given the obvious conflicting reports given by plaintiff on numerous occasions and the extreme nature of many of these additional stories, doubt is cast upon their truthfulness as well.

◆ Plaintiff told a social worker that she buys prescription drugs off the black market. She also reported to the social worker that her mother hit her father and set him on fire.

◆ Plaintiff told Michael Walsh in connection with her disability claim that she had been arrested three or four times for domestic dispute issues, once for possession of marijuana, twice for public intoxication, once for DWI and one for a hot check charge. This does not seem to include the alleged arrest after plaintiff turned in child abusers.

◆ Plaintiff told Dr. Brown in 2012 that her husband tried to strangle her in her sleep twice, and once he jumped her with a knife and tried to stab her.

◆ One of her step sons robbed her of everything she had.

◆ In June 2011, plaintiff saw Dr. Sutton and reported, for the first time, that her sister was in a long-term psychiatric facility due to bipolar disorder and that her mother suffered from that condition as well. On that day, plaintiff was given her first prescription for Seroquel in addition to a refill of Depakote.

I set out these examples of conflicting allegations on plaintiff's part not merely to affirm the decision of the Commissioner on this issue but to demonstrate the very strange nature of plaintiff's conduct. As mentioned above, this does not appear to be a case where plaintiff's conflicting allegations are goal-directed. In fact, in some instances she seems to be sabotaging her efforts to help herself, for example by describing a serious history of illegal drug abuse and arrest while attempting to get Social Security disability benefits, when it is not at all clear that those damaging things actually occurred.

According to the Mayo Clinic:[9]

Cluster B personality disorders are characterized by dramatic, overly emotional or unpredictable thinking or behavior. They include antisocial personality disorder, borderline personality disorder, histrionic personality disorder and narcissistic personality disorder. It's not necessary to exhibit all the signs and symptoms listed for a disorder to be diagnosed.

Antisocial personality disorder
• Disregard for others' needs or feelings
• Persistent lying, stealing, using aliases, conning others

---

[9]http://www.mayoclinic.org/diseases-conditions/personality-disorders/basics/symptoms/con-20030111

- Recurring problems with the law
- Repeated violation of the rights of others
- Aggressive, often violent behavior
- Disregard for the safety of self or others
- Impulsive behavior
- Consistently irresponsible
- Lack of remorse for behavior

Borderline personality disorder
- Impulsive and risky behavior, such as having unsafe sex, gambling or binge eating
- Unstable or fragile self-image
- Unstable and intense relationships
- Up and down moods, often as a reaction to interpersonal stress
- Suicidal behavior or threats of self-injury
- Intense fear of being alone or abandoned
- Ongoing feelings of emptiness
- Frequent, intense displays of anger
- Stress-related paranoia that comes and goes

Histrionic personality disorder
- Constantly seeking attention
- Excessively emotional, dramatic or sexually provocative to gain attention
- Speaks dramatically with strong opinions, but few facts or details to back them up
- Easily influenced by others
- Shallow, rapidly changing emotions
- Excessive concern with physical appearance
- Thinks relationships with others are closer than they really are

Narcissistic personality disorder
- Belief that you're special and more important than others
- Fantasies about power, success and attractiveness
- Failure to recognize others' needs and feelings
- Exaggeration of achievements or talents
- Expectation of constant praise and admiration
- Arrogance
- Unreasonable expectations of favors and advantages, often taking advantage of others
- Envy of others or belief that others envy you

Although some of these disorders were mentioned briefly in some of the medical

records, plaintiff has never been examined with an eye toward determining whether she truly

suffers from any of these conditions. In fact, every time plaintiff has been examined by a

mental health expert, her subjective allegations were relied upon heavily and are shown above

to be not entirely true.  As a result, it is not possible to determine, based on this record, whether plaintiff is currently disabled or whether she was disabled at any time in the past.

Plaintiff argues that she meets Listing 12.08 which reads as follows:

12.08  Personality disorders: A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A.      Deeply ingrained, maladaptive patterns of behavior associated with one of the following:

      1.      Seclusiveness or autistic thinking; or

      2.      Pathologically inappropriate suspiciousness or hostility; or

      3.      Oddities of thought, perception, speech and behavior; or

      4.      Persistent disturbances of mood or affect; or

      5.      Pathological dependence, passivity, or aggressivity; or

      6.      Intense and unstable interpersonal relationships and impulsive and damaging behavior;

AND

B.      Resulting in at least two of the following:

      1.      Marked restriction of activities of daily living; or

      2.      Marked difficulties in maintaining social functioning; or

      3.      Marked difficulties in maintaining concentration, persistence, or pace; or

      4.      Repeated episodes of decompensation, each of extended duration.

Although several mental health professionals have rendered opinions with regard to plaintiff's restrictions in activities of daily living; maintaining social functioning; and maintaining concentration, persistence or pace, as mentioned above, none of these

professionals has been presented with the overwhelming evidence of plaintiff's tendency to present largely conflicting reports about her condition and her past; rather they have relied on plaintiff's allegations on that given day without the ability to compare those allegations to her other statements.

## VII. CONCLUSIONS

The evidence is clear that plaintiff's physical impairments are not disabling. Physical examination by Hassan Najeeb Albataineh, M.D., was normal on September 20, 2007. Physical examination at Arkansas State Hospital was normal in November 2008. When plaintiff was hospitalized in November 2008, she rated her physical pain the worst it could get, yet her only pain medication in the hospital was Tylenol. Physical exam in February 2012 was normal. Plaintiff has almost no medical history of treatment for physical pain.

I also find that the evidence supports the ALJ's finding that Dr. Brown's opinion is deserving of little if any weight. Much of his opinion deals with issues reserved to the Commissioner, such as whether plaintiff can work. In addition, as discussed above, his opinion relies heavily on plaintiff's noncredible subjective allegations, and his opinion is internally inconsistent.

Finally, I note that during almost all of the time covered by these medical records, plaintiff was not taking her medication as prescribed or was not participating in therapy as recommended. Therefore, in addition to determining what plaintiff's impairments and restrictions truly are, the Commissioner shall determine whether those impairments can be controlled if plaintiff were to comply with recommended treatment.

Based on all of the above, I find that the substantial evidence in the record as a whole is not sufficient to determine whether plaintiff is disabled. Therefore, it is

ORDERED that the decision of the Commissioner is reversed pursuant to Sentence Four. It is further

ORDERED that this case is remanded for further consideration which shall include an additional medical opinion. The medical professional rendering the opinion shall be provided not only with plaintiff's medical records but with this order which provides a very detailed summary of plaintiff's 948-page administrative transcript for the purpose of tying together all of her allegations in connection with medical treatment and her attempt to secure disability benefits. The Commissioner shall conduct another hearing during which plaintiff shall be given an opportunity to address the issues raised in this order.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 1, 2014