IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

CARALEE AKKERHUIS,            )
                              )
            Plaintiff,        )
                              )
    v.                        )   Case No.
                              )   13-3159-CV-S-REL-SSA
CAROLYN W. COLVIN, Acting     )
Commissioner of Social Security, )
                              )
            Defendant.        )

**ORDER**

Before the court is plaintiff's motion for an award of attorney's fees in the amount of $1,742.59 pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412. In her response, defendant objects to an award of fees on the ground that the Commissioner's position was substantially justified. For the following reasons, I find that the Commissioner's position was indeed substantially justified. Therefore, plaintiff's motion for attorney's fees will be denied.

*I.    BACKGROUND*

On August 6, 2007, plaintiff applied for disability benefits alleging that she had been disabled since April 4, 2007. Plaintiff claimed that she was disabled from arthritis in her legs and back, a right leg injury, high blood pressure, memory loss, a heart condition, and post traumatic stress disorder. Plaintiff's application was denied. On May 18, 2009, Administrative Law Judge Edward Starr found plaintiff disabled as of November 13, 2008, which was approximately a year and a half after her alleged onset date. Plaintiff appealed the partially favorable decision. On December 9, 2010, the Appeals Council denied review. Plaintiff appealed to the federal district court; and on

October 3, 2011, Judge Nanette Laughrey reversed the decision of the Commissioner and remanded for further consideration. On December 19, 2011, the Appeals Council vacated the final decision of the Commissioner pursuant to the court's sentence four reversal and remand, and directed the ALJ to offer plaintiff an opportunity for a hearing and "take any further action needed to complete the administrative record and issue a new decision." On February 11, 2013, Administrative Law Judge David Fromme found that plaintiff was not under a "disability" as defined in the Act. Plaintiff appealed that decision, and her case was assigned to me.

Plaintiff argued on appeal that the ALJ erred in failing to give controlling weight to the opinions of Drs. Smith and Brown, in failing to give more weight to the disabling GAF scores in the medical records, and in failing to consider whether plaintiff's condition was the equivalent of a listed impairment with respect to her personality disorder. The remainder of her brief argued that she was disabled because of her physical condition.

On July 1, 2014, I entered an order reversing the decision of the Commissioner and remanding for further consideration -- but not on any grounds raised by plaintiff in her brief. The record in this case was 948 pages long. After preparing a detailed summary of plaintiff's medical records, I determined that (1) the ALJ properly found that plaintiff was not disabled due to any physical impairment, (2) the ALJ properly gave little if any weight to the opinion of Drs. Smith and Brown, (3) the ALJ properly found plaintiff not credible, and (4) during almost the entire time covered by the medical records plaintiff was not taking her medication as prescribed or was not participating in therapy

2

as recommended. However, I found that the medical records showed a disturbing trend of plaintiff's bizarre misrepresentations, often not designed to further any particular goal. The following is an excerpt from my order reversing the ALJ's decision:

> This record is replete with instances of far-fetched, easily disproved, and sometimes bizarre contradictions on plaintiff's part. Some examples:
>
> ◆ In a Function Report plaintiff said she cannot drive because her leg hurts too much to use the gas pedal. She told Dr. Efird in October 2007 in connection with her disability claim that she let her license expire because of a car accident in April 2007. In 2012 in connection with her disability claim she said she stopped driving because the smell of a car triggered flashbacks of her abusive husband, even though she does not have trouble riding in a car.
>
> ◆ Plaintiff testified that she weighed 190 pounds in 1993. There are no medical records from 1993; however, in January 1996 she weighed 270 pounds. She testified in November 2012 that since she stopped working in April 2007 her weight has "gotten out of control." However, her medical records show that from 1996 through 2012, her weight remained stable, although she was obese that entire time.
>
> ◆ Plaintiff testified that she was in a bad car accident in April 2007. There are medical records dating back to 1996; however, there are no medical records substantiating plaintiff's testimony that she was ever in a car accident. She did not mention it during a hospital visit four months later, and she did not mention it to Dr. Efird in October 2007 when he examined her in connection with her disability claim. In November 2008 when plaintiff was hospitalized, she was asked if she had ever been in a severe accident. She did not report any accident from April 2007, but she did say she had been hit by a cement truck when she was a teenager, an allegation that appears nowhere else in this record.
>
> ◆ Plaintiff testified that she suffered falls at work in June 2006 and February 2007. The medical records support her allegation of a fall in June 2006; however, there are no medical records substantiating her claim of a fall in February 2007.
>
> ◆ Plaintiff testified during the first hearing that she was hit in the head and knocked unconscious five or six times by her husband. During the second hearing, she testified that her husband would beat her until she was unconscious three or four times a week, sometimes more often. Plaintiff's medical records from June 2,

3

2006, establish that when she fell at work, she did not lose consciousness. Plaintiff told Dr. Smith in January 2008 during a consultative examination that she had a history of multiple closed head injuries due to car accidents and assaults by her spouse, and at least one incident of being choked to unconsciousness. In May 2012 plaintiff denied any history of unconsciousness. In August 2012 she told Dr. Brown in connection with her disability case that she had experienced several head injuries through the years, several of which had rendered her unconscious.

◆ Plaintiff testified in November 2012 that she has a GED and no further education. She told a social worker in March 2002 that she was a few hours short of having an Associate's degree in business. Plaintiff told emergency room personnel in November 2008 that she had a Master's degree in early childhood education. She told a social worker in June 2010 that she had a Master's degree in early childhood education and taught for more than 20 years. Plaintiff told psychologist Michael Walsh that she had a GED and had completed two years of college courses in child development.

◆ On January 22, 1996, plaintiff denied seizures. The first time seizures were mentioned by plaintiff was during a consultative examination with Vann Smith, Ph.D., in January 2008 in connection with her disability application. Plaintiff told Dr. Alken in July 2010 that she was taking Depakote for seizures she had been having since her stroke. Plaintiff had never been prescribed Depakote up to that point and there is no medical support for her allegation of stroke. In December 2010, plaintiff went to the emergency room after allegedly falling. She reported a past medical history of seizures. Plaintiff reported a history of seizures when she was seen at the emergency room in December 2010. In January 2011 plaintiff told Nurse Jennifer Whitaker that she had a history of seizures. Ms. Whitaker wrote plaintiff a prescription for Depakote. The very next day, plaintiff was seen by another medical provider for a rash. She again reported a history of seizures and said she is not able to take Depakote because it causes involuntary movements, but that she had taken Flexeril and Cyclobenzaprine (Valium) in the past which had worked well. Despite her requesting these two medications, it is not clear that any prescriptions were written that day. In October 2011, plaintiff denied seizures although she said she had been out of her Depakote. In December 2011, plaintiff went to the emergency room after having fallen down the stairs, and she denied seizure activity. She was discharged on her normal medication which did not include any psychotropic medication or seizure medication. In May 2012 plaintiff told psychologist Michael Walsh, in connection with her disability claim, that she had had two seizures in her 40s which were caused by stress.

4

- On January 3, 2002, plaintiff denied ever having had suicidal ideation. In April 2002, she said she thought about suicide in 1994 when her baby died -- she took out a gun and contemplated committing suicide for about five hours. In April 2005, plaintiff denied suicidal ideation. On October 16, 2007, plaintiff denied suicidal ideation when being examined in connection with her disability claim. In November 2008 when she was hospitalized, plaintiff completed a suicide assessment in which she denied a history of suicide attempt or self harm. In May 2012 in connection with her disability case, she said she got a gun in 1994 with the intention of shooting herself. In August 2012, she told Dr. Brown, in connection with her disability case, that forgetting causes her to wonder whether it is worth going on with life. She reported that in April 2011 she drank a large amount of whiskey in an attempt to kill herself.

- Plaintiff testified in November 2012 that she had to go to the emergency room several times after her alleged car accident to get pain medication. Plaintiff's medical records do not show emergency room visits for pain medication. Plaintiff told a nurse in April 2002 that she had been to the emergency room multiple times due to hives associated with anxiety and nervousness. The medical records do not support this allegation.

- Plaintiff testified in November 2012 that she has suffered with migraine headaches for ten years and that she gets a migraine headache once or twice a month, each lasting for 12 or 13 hours. In February 2012, plaintiff saw Connie Armstrong at Ozarks Medical Center and denied headaches. There is no complaint of migraine headaches in any medical record.

- Plaintiff testified in November 2012 that she has suffered with hallucinations since 2000. In November 2004, she denied hallucinations when being treated by Dr. Austin for her mental condition. In April 2005, plaintiff saw Dr. Austin for her mental condition and denied hallucinations. In May 2005, plaintiff denied hallucinations. The first mention of hallucinations in any medical record is in an October 2007 report of Dr. Efird who examined plaintiff in connection with her disability claim. She said these auditory hallucinations started about 4 or 5 months earlier, or in May or June 2007, and they occur about twice a week. In November 2008 while hospitalized, plaintiff denied hallucinations. In June 2010, plaintiff told a social worker she had experienced auditory hallucinations her entire life but they could be controlled with the right medication. In May 2012 plaintiff denied hallucinations to Mr. Walsh in connection with her disability case. In August 2012, in connection with her disability case, she told Dr. Brown that she has experienced auditory hallucinations since 2007.

- Plaintiff testified in March 2009 that she does not own a television set because she hears voices from them. Yet in November 2012 she described her day as including watching movies and the news on television every day.

- On June 2, 2006, plaintiff denied a history of stroke. On August 26, 2007, she denied a history of stroke. On June 14, 2010, plaintiff told a social worker that she had a history of stroke. She said her first stroke occurred on November 12, 2008; however, medical records show she was in jail on November 11 and was admitted to Arkansas State Hospital for psychiatric treatment on November 13, and nothing was ever said about a stroke. Plaintiff said her second stroke occurred on October 12 or 14, 2009; however, she did not provide any medical records for the entire year of 2009. Plaintiff told Dr. Alken in July 2010 that she had a stroke on November 13, 2008, again right after she was in jail. In December 2010, plaintiff went to the emergency room after having allegedly fallen. She reported that she had had a stroke sometime in the past which caused her to shuffle rather than walk normally. In December 2010 plaintiff reported having had a stroke three years earlier. In May 2012, she told psychologist Michael Walsh, in connection with her disability case, that she had had a stroke in 2008 which he did not appear to believe.

- Plaintiff alleged that she wound up in the hospital in November 2008 because she had recently learned one of her sons was using methamphetamine which caused her to become extremely stressed, landing her in the hospital. Elsewhere in the records of that hospitalization, she said she went to the hospital due to a nose bleed. When she was not allowed to call her son, she became abusive toward hospital staff and was taken to jail where she had a psychological screening.

- Plaintiff reported on March 4, 2002, to a social worker that she started smoking marijuana at age 13 and using alcohol at age 15. She said she used acid, cocaine, and mushrooms for 2 1/2 years in her teens. In April 2002, she told a nurse that in approximately 1993 she drank 1.75 liters of hard liquor every day and that until 5 or 6 years ago she used marijuana on a daily basis. She said she had used methamphetamine, LSD and speed in the past. In October 2005, plaintiff said she had been sober since November 7, 2003, and that before then she had been drinking a pint of alcohol per day. On August 30, 2006, she reported drinking alcohol occasionally. A year later, on August 26, 2007, she said she had not had any alcohol for the past 10 to 12 years. In October 2007, plaintiff told Dr. Efird in connection with her disability claim that she had not smoked marijuana in three years and that she has a beer about twice a year. Plaintiff told Dr. Smith in connection with her disability case in January 2008 that she was a non-drinker. In November 2008, she described having consumed whiskey the week before. In June 2010 plaintiff told a social worker that she

6

frequently uses marijuana, "passing a joint, passing a bowl" which, I note, suggests more interaction with others than is currently alleged. She alleged last using methamphetamine in 2007. She said she misuses prescription medications, and she said she was a needle junkie from 1977 through 1980. In June 2011, plaintiff reported to Dr. Sutton that she previously drank a six pack and a pint of whiskey per day but that she stopped drinking alcohol 3 weeks earlier. In December 2011, plaintiff denied drinking and she denied history of drug abuse. In May 2012 plaintiff told Mr. Walsh that she had not consumed any alcohol since April 6, 2012, and that she had been known to consume a fifth of whiskey at one sitting. She said she last smoked marijuana in 2005. Plaintiff told Dr. Brown that there was never a time in her life when she drank alcohol daily, but she binge drank for a time after completing high school. She also told him that she "has never used street drugs."

◆ Regarding New Year's Eve 2001, plaintiff at one time said her husband pushed her down because she was physically assaulting others, and another time said her husband tried to choke her that night.

◆ Plaintiff told Dr. Austin in November 2004 that she was the youngest of four girls and always felt like the "add on," at the bottom of the love chain. In other medical records plaintiff said she was the third child with a sister several years younger. Plaintiff told a social worker in June 2010 that she is one of 8 children. She told psychologist Michael Walsh in May 2012, in connection with her disability case, that she had one older and one younger sibling.

In addition to the allegations that are easily disproved, there are many unusual stories [FN:1 - I do not mean to suggest that all of these allegations are false. However, given the obvious conflicting reports given by plaintiff on numerous occasions and the extreme nature of many of these additional stories, doubt is cast upon their truthfulness as well.] told by plaintiff as reflected in her medical records and appear to have no ulterior motive beyond simply relaying the story:

◆ In April 2002, plaintiff told a nurse that she saw her grandmother's watch in a pawn shop and went ballistic, requiring the police to be called. However, plaintiff said elsewhere that her parents were both from New York where she grew up before she moved away. It is unclear how she would have seen her grandmother's watch in a pawn shop in the Midwest. Regardless, there are no other records that mention this episode.

7

- In May 2005, plaintiff told Dr. Austin that she turned in child abusers who came back on her and she had the police called on her three times in one night and was put in jail for 4 to 5 hours; her ex husband bailed her out of jail from North Carolina.

- In October 2007, plaintiff told Dr. Efird, in connection with her disability claim, that she had been arrested on hot check charges, but that was due to a banking error. She told a social worker in June 2010 that she wrote hundreds of thousands of dollars' worth of bad checks and spent a little over a year in prison as a result.

- Plaintiff told Dr. Austin in November 2004 that she had been going through a divorce for 2 1/2 years and a typographical error resulted in the whole thing being "thrown out."

- In July 2006, plaintiff told a nurse that she had lost a very good friend the day before in a terrible motorcycle accident. That traumatic event was never mentioned again in any of plaintiff's medical or counseling records.

- In June 2010, plaintiff told a social worker she had been administered shock therapy in 1980. She said she had been hospitalized for psychiatric reasons at least every 2 years since she was 17. Yet the records reflect a total of 2 hospitalizations, one prior to plaintiff's alleged onset date.

- Plaintiff told a social worker in June 2010 that she had fibromyalgia, but she has never even alleged symptoms of fibromyalgia much less been diagnosed with that condition. She also reported having had breast, ovarian and possibly colon cancer; however, her medical records do not support these allegations.

- Plaintiff said she started using methamphetamine in the late 1990s after her husband put some in her coffee and her son's coffee. She used it until 2007.

- Plaintiff told a social worker that she buys prescription drugs off the black market. She also reported to the social worker that her mother hit her father and set him on fire.

- Plaintiff told Michael Walsh in connection with her disability claim that she had been arrested three or four times for domestic dispute issues, once for possession of marijuana, twice for public intoxication, once for DWI and one for a hot check charge. This does not seem to include the alleged arrest after plaintiff turned in child abusers.

- Plaintiff told Dr. Brown in 2012 that her husband tried to strangle her in her sleep twice, and once he jumped her with a knife and tried to stab her.

- One of her step sons robbed her of everything she had.

- In June 2011, plaintiff saw Dr. Sutton and reported, for the first time, that her sister was in a long-term psychiatric facility due to bipolar disorder and that her mother suffered from that condition as well. On that day, plaintiff was given her first prescription for Seroquel in addition to a refill of Depakote.

I set out these examples of conflicting allegations on plaintiff's part not merely to affirm the decision of the Commissioner on this issue but to demonstrate the very strange nature of plaintiff's conduct. As mentioned above, this does not appear to be a case where plaintiff's conflicting allegations are goal-directed. In fact, in some instances she seems to be sabotaging her efforts to help herself, for example by describing a serious history of illegal drug abuse and arrest while attempting to get Social Security disability benefits, when it is not at all clear that those damaging things actually occurred.

Although some [Cluster B personality] disorders were mentioned briefly in some of the medical records, plaintiff has never been examined with an eye toward determining whether she truly suffers from any of these conditions. In fact, every time plaintiff has been examined by a mental health expert, her subjective allegations were relied upon heavily and are shown above to be not entirely true. As a result, it is not possible to determine, based on this record, whether plaintiff is currently disabled or whether she was disabled at any time in the past.

Plaintiff argues that she meets Listing 12.08 . . . . Although several mental health professionals have rendered opinions with regard to plaintiff's restrictions in

9

activities of daily living; maintaining social functioning; and maintaining concentration, persistence or pace, as mentioned above, none of these professionals has been presented with the overwhelming evidence of plaintiff's tendency to present largely conflicting reports about her condition and her past; rather they have relied on plaintiff's allegations on that given day without the ability to compare those allegations to her other statements.

(see Order Reversing and Remanding, document number 17, pp. 62-70).

The opinion of the ALJ was reversed and the case was remanded:

for further consideration which shall include an additional medical opinion. The medical professional rendering the opinion shall be provided not only with plaintiff's medical records but with this order which provides a very detailed summary of plaintiff's 948-page administrative transcript for the purpose of tying together all of her allegations in connection with medical treatment and her attempt to secure disability benefits. The Commissioner shall conduct another hearing during which plaintiff shall be given an opportunity to address the issues raised in this order.

## II.  EQUAL ACCESS TO JUSTICE ACT

The Equal Access to Justice Act ("EAJA") departs from the general rule that each party to a lawsuit pays his or her own legal fees. See Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 257 (1975). The EAJA authorizes the payment of fees to a prevailing party in an action against the United States. "[T]he Government may defeat this entitlement by showing that its position in the underlying litigation 'was substantially justified.'" Scarborough v. Principi, 541 U.S. 401, 405 (2004) (citing 28 U.S.C. § 2412(d)(1)(A)). Section 2412(d)(1)(B) directs that the application for fees include: (1) a showing that the applicant is a prevailing party; (2) a showing that the

10

applicant is eligible to receive an award (i.e., the claimant's net worth did not exceed $2,000,000[1] at the time the action was filed); and (3) a statement of the amount sought, including an itemized statement from any attorney stating the actual time expended and the rate charged. Section 2412(d)(2)(B) further provides that the fees shall be awarded "unless the court finds that the position of the United States was substantially justified."

> Unlike the § 2412(d)(1)(B) prescriptions on what the applicant must *show* (his "prevailing party" status and "eligib[ility] to receive an award," and "the amount sought, including an itemized statement" reporting "the actual time expended and the rate at which fees and other expenses were computed"), the required "not substantially justified" allegation imposes no proof burden on the fee applicant. It is, as its text conveys, nothing more than an allegation or pleading requirement. The burden of establishing "that the position of the United States was substantially justified," § 2412(d)(1)(A) indicates and courts uniformly have recognized, must be shouldered by the Government. . . . Congress did not, however, want the "substantially justified" standard to "be read to raise a presumption that the Government position was not substantially justified simply because it lost the case. . . ." By allocating the burden of pleading "that the position of the United States was not substantially justified" -- and that burden only -- to the fee applicant, Congress apparently sought to dispel any assumption that the Government must pay fees each time it loses.

Scarborough v. Principi, 541 U.S. at 414-415 (emphasis in the original) (citations omitted).

A position enjoys substantial justification if it has a clearly reasonable basis in law and fact. Goad v. Barnhart, 398 F.3d 1021, 1025 (8th Cir. 2005) (citing Brouwers v. Bowen, 823 F.2d 273, 275 (8th Cir. 1987)). "Accordingly, the Commissioner can advance a losing position in the district court and still avoid the imposition of a fee

---

[1] Defendant points out that plaintiff's motion for attorney's fees does not state that her net worth did not exceed $2,000,000 as required; however, I will take judicial notice of the financial affidavit filed in connection with plaintiff's motion to proceed in forma pauperis and will accordingly find that her net worth did not exceed $2,000,000.

11

award as long as the Commissioner's position had a reasonable basis in law and fact." Id. Further, a loss on the merits by the Commissioner does not give rise to a presumption that she lacked substantial justification for her position. Goad v. Barnhart, 398 F.3d at 1025 (citing Keasler v. United States, 766 F.2d 1227, 1231 (8th Cir. 1985)).

Failure to follow circuit court precedent can result in a finding that the Commissioner's position was not substantially justified. Koss v. Sullivan, 982 F.2d 1226, 1229 (8th Cir. 1993). Here, however, there is no evidence that the Commissioner failed to follow any regulations or case law. The ALJ considered all of plaintiff's medical records, spanning from January 6, 1996, through September 3, 2012 -- nearly 17 years. The records dealing with plaintiff's mental condition included those from two hospitalizations; treatment records from Bruce Harms, a licensed clinical social worker; treatment records from Colleen Brill, a psychiatric registered nurse; treatment records from Michael Hagaman, M.D.; treatment records from R. Stephen Austin, M.D.; treatment records from Christiana Thompson, a nurse practitioner; treatment records from Richard Alken, M.D.; treatment records from Shelley Sutton, D.O.; consultative records from Michael Walsh, M.S., a licensed psychologist; the opinion of Paul Cherry, Ph.D., a consultative psychologist; the opinion of Philip Brown, Ph.D., a consultative examining psychologist; the opinion of Terry Efird, Ph.D., a consultative examining psychologist; and the opinion of Vann Smith, Ph.D., a consultative examining neuropsychologist. The ALJ did not err in failing to develop the record; the ALJ did not err in assessing the opinions of any of these individuals; the ALJ did not err in assessing plaintiff's credibility. Additionally, the ALJ did not err in analyzing plaintiff's

12

medical records with respect to her physical condition. The sole reason for reversal and remand is because none of the mental health professionals had the benefit of seeing the entirety of plaintiff's record which is only an issue here because she contradicted herself in far-fetched, easily disproved and sometimes bizarre ways to both treating doctors and consultative doctors.

Dr. Cherry saw plaintiff in 2007; Dr. Efird saw her in 2007; Dr. Smith saw her in 2008; Michael Walsh, M.S., saw her in 2012; and Dr. Brown saw her in 2012. Although the ALJ properly assessed the credibility of each of these medical professionals who provided an opinion about her mental abilities, none of these individuals addressed the strange and self-sabotaging contradictions in plaintiff's subjective reports.

Further, plaintiff's position does not provide the basis for the remand. Plaintiff argued in this appeal that the ALJ should have given controlling weight to the opinion of Dr. Smith who saw plaintiff in 2008. Because he provided his opinion in 2008, that opinion is not based on all of the medical evidence and in fact was rendered prior to four years' worth of plaintiff's mental health records. Plaintiff told Dr. Smith she had a history of seizure disorder; however, there are no medical records suggesting seizure disorder and plaintiff specifically denied seizures in many of her treatment records. Plaintiff reported a history of multiple closed head injuries and at least one incident of being choked to unconsciousness, leading to a diagnosis of diffuse organic brain dysfunction by Dr. Smith. Yet in 2012, subsequent to Dr. Smith's opinion, plaintiff denied any history of unconsciousness, casting doubt on the accuracy of Dr. Smith's

13

earlier assessment. Further, Dr. Smith provided an opinion that plaintiff was "disabled at this time," which is not a medical opinion.

Plaintiff argued that the ALJ should have given controlling weight to the opinion of Dr. Brown who saw plaintiff in 2012, but his opinion was that "it is very unlikely she would be able to secure and maintain gainful employment," which is a decision left to the Commission and is not a medical opinion. Further, Dr. Brown relied on plaintiff's subjective reports which were significantly different from her subjective reports to other doctors, an issue that was not addressed (and likely not even known) by Dr. Brown. Therefore, it would have been improper for the ALJ to have relied on the opinion of either of these doctors.

In order to show that its position was substantially justified, the government must show that "it acted reasonably at all stages of the litigation." US SEC v. Zahareas, 374 F.3d 624, 627 (8th Cir. 2004) ("the EAJA provides that the 'United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law.' Therefore, the government may be liable for attorneys' fees if it acted in bad faith."). In this case, as discussed above, the government's position was substantially justified. The ALJ did not err in assessing plaintiff's credibility, in failing to develop the record, or in failing to give controlling weight to Drs. Smith and Brown as plaintiff urges. But for the very unusual circumstances of this case -- 17 years' worth of medical records; three administrative hearings; a previous remand by the federal district court; doctors' opinions rendered at various stages during this lengthy litigation; a very voluminous medical record; and plaintiff's very bizarre history of fabricating outrageous

stories about her own behavior, things she has experienced, diagnoses she has suffered, etc., all in a case based on a mental impairment, which means the doctors rendering opinions necessarily have to rely on the reports of plaintiff -- I would have found no reason to reverse the decision of the Commissioner and remand this case.

"In order for the [government] to prevail, [it] must show that [its] position was 'clearly reasonable, well founded in law and fact, solid though not necessarily correct.'" Friends of Boundary Waters Wilderness v. Thomas, 53 F.3d 881, 885 (8th Cir. 1995) (citing Sec. Exch. Com'n v. Kluesner, 834 F.2d 1438, 1440 (8th Cir. 1987)). In deciding to reverse the decision of the Commissioner, this court did not disagree with any position put forth by the government in this case; rather, the reversal and remand was based solely on the unusual and bizarre nature of plaintiff's subjective reports to various doctors and other mental health professionals over a 17-year period. Based on these unusual circumstances, another look is necessary, although the ALJ's ultimate decision may still be the same, i.e., that plaintiff is not disabled.

### *III.*   *CONCLUSION*

Based on all of the above, I find that the defendant's position was substantially justified and therefore plaintiff is not entitled to the requested $1,742.59 in attorney's fees pursuant to the Equal Access to Justice Act. Therefore, it is

15

Case 6:13-cv-03159-REL   Document 24   Filed 02/17/15   Page 15 of 16

ORDERED that plaintiff's motion for fees in the amount of $1,742.59 pursuant to the Equal Access to Justice Act is denied.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 17, 2015